# EXHIBIT B

ELECTRONICALLY FILED
Superior Court of California,
County of Alameda
08/16/2024 at 04:30:00 PM
By: Damaree Franklin,
Deputy Clerk

1   JOHN H. GOMEZ (CA Bar No. 171485)
    JOSHUA R. HARRIS (FL Bar No. 124124) *pro hac vice pending*
2   **GOMEZ TRIAL ATTORNEYS**
3   755 FRONT STREET, SAN DIEGO, CA 92101
    PH: 619-237-3490 / FAX: 619-237-3496
4   john@getgomez.com
    josh@getgomez.com
5

6   GALEN M. HAIR (LA Bar No. 32865) *pro hac vice pending*
    KYLE C. USNER (LA Bar No. 38923) *pro hac vice pending*
7   **HAIR SHUNNARAH TRIAL ATTORNEYS**
    3001 17TH ST, METAIRIE, LA 70002
8   PH: 504-684-5200 / FAX: 504-613-6351
    hair@hstalaw.com
9   kusner@hstalaw.com

10  *Attorneys for Plaintiffs*

11

12              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
                        **COUNTY OF ALAMEDA**
13                      (UNLIMITED JURISDICTION)

14

15  MELISSA BLACK, as Guardian ad Litem and on      Case No: 24CV087673
    behalf of A.G., a minor,
16                                                  **COMPLAINT FOR DAMAGES**

17                                   Plaintiffs,    **1.    Strict Liability**
                  vs.                               **2.    Negligence**
18                                                  **3.    Common Law Negligence**
19  EPIC GAMES, INC.; MICROSOFT                     **4.    False Representation**
    CORPORATION; MOJANG A.B.; SONY                  **5.    Intentional Tort (Fraudulent Deceit,**
20  INTERACTIVE ENTERTAINMENT LLC;                  **       Deceit, Concealment)**
    NINTENDO OF AMERICA, INC.; and the              **6.    Concert-of-Action**
21  FIRST DOE through ONE HUNDREDTH DOE,            **7.    Punitive Damages**
    inclusive,
22                                                  **DEMAND FOR JURY TRIAL**
                                     Defendants.
23

24

25

26

27

28
                                    1

## COMPLAINT

1.    Plaintiff MELISSA BLACK and her minor child Plaintiff A.G. via their[1] Guardian ad Litem, bring this action for personal injuries against the above-captioned **DEFENDANTS** (hereinafter collectively referred to as "the **DEFENDANTS**") to recover damages, pursuant to and as available under the laws of the State of California, arising from the severe injuries sustained by each because of Plaintiff A.G.'s use of **DEFENDANTS'** video gaming products. Plaintiffs, therefore, now allege as follows:

## INTRODUCTION

2.    Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

3.    This action seeks to hold the **DEFENDANTS** accountable for causing and contributing to a public health crisis, amounting to a global epidemic, wherein minors suffer from addiction[2] or disordered compulsion to **DEFENDANTS'** addictive and unreasonably dangerous gateway video gaming products.

4.    The products at issue consist of: Minecraft and Fortnite, including their patent-protected technologies of addictive design features and the mechanisms systems, and/or devices through which minors use, access, and consume these products (hereinafter collectively referred to as "Products").

5.    These Products are marketed as and serve as "gateway" video gaming products for minors in that they serve to introduce minors to video gaming and the addictive mechanisms found within **DEFENDANTS'** Products.

6.    The addiction and/or disordered compulsion to using the Products causes profound harm, triggering an extraordinary sequela of catastrophic and life-altering injuries to users and their families.

---

[1] This Complaint intentionally uses a gender-neutral pronoun for the minor Plaintiff to further ensure said Plaintiff's privacy.
[2] Addiction, as defined in  in the seminal article *Addictive behaviors: Etiology and Treatment,* published by the American Psychological Association in its 1988 *Annual Review of Psychology,* is:

> a repetitive habit pattern that increases the risk of disease and/or associated personal and social problems. Addictive behaviors are often experienced subjectively as 'loss of control' – the behavior contrives to occur despite volitional attempts to abstain or moderate use. These habit patterns are typically characterized by immediate gratification (short term reward), often coupled with delayed deleterious effects (long term costs). Attempts to change an addictive behavior (via treatment or self-initiation) are typically marked with high relapse rate.

7.    The Products are defective and unreasonably dangerous in that they were specifically designed (whether negligently and/or intentionally) to cause users, specifically minors, to become psychologically addicted[3] to using, or to develop a disordered compulsion to using, video game products.

8.    **DEFENDANTS** failed to provide any warning to users or their caregivers of the harm posed by using the Products, resulting in extraordinary detriment to users and their caregivers, including Plaintiffs herein.,

9.    The harm manifests in physical, emotional, mental, and financial damage to users and their families.

10.  **DEFENDANTS** have implemented in-game monetization schemes, particularly microtransactions, which are fueled by operant conditioning and other methodologies designed to target users' dopamine receptors.

11.  These schemes trigger users' desire to hyperfocus on using the Products more frequently and extensively, thereby spending increasing amounts of real money within the Products.

12.  The defective and unreasonable dangerous nature of the Products extraordinarily benefits **DEFENDANTS** financially.

13.  **DEFENDANTS'** action arise from quintessential corporate greed, resulting from a conscious and deliberate decision borne from engaging in ruthless cost-benefit analysis.

14.  Under the guise of providing harmless and safe digital interactive games and entertainment to the masses, **DEFENDANTS** placed profits over the health and well-being of consumers, including minors, to whom they aggressively market their defective Products.

15.  **DEFENDANTS'** decision has resulted in a considerable and growing population of minors who have developed an addiction or disordered need to use **DEFENDANTS'** Products, to the extreme detriment of their still-developing brains.

---

[3] Addiction researchers agree that addiction involves six core components: (1) Salience—the activity dominates thinking and behavior; (2) Mood modification—the activity modifies/improves mood; (3) Tolerance—increasing amounts of the activity are required to achieve previous effects; (4) Withdrawal—the occurrence of unpleasant feelings when the activity is discontinued or suddenly reduced; (5) Conflict—the activity causes conflicts in relationships, in work/education, and other activities; and (6) Relapse—a tendency to revert to earlier patterns of the activity after abstinence or control.

16.  As of 2022, "Gaming disorder"—disordered use of and/or play with video gaming products—is a recognized mental health disorder by the World Health Organization and International Statistical Classification of Diseases and Related Health Problems. "Gaming disorder" is included within the subcategory "ICD-11" entitled "Disorders due to substance use or addictive behaviors."[4] "Gaming disorder" is defined in the 11th revision of the International Classification of Diseases as a pattern of persistent or recurrent gaming behavior, specifically "digital gaming" or "video-gaming," which may be online or offline, manifested by: impaired control over gaming (e.g., onset, frequency, intensity, duration, termination, context); increasing priority given to gaming to the extent that gaming takes precedence over other life interests and daily activities; and continuation or escalation of gaming despite the occurrence of negative consequences.

17.  Addicted and disordered use of video games and internet gaming is a recognized, diagnosable mental disorder and form of behavioral addiction codified by the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5).[5] The diagnostic symptoms of internet gaming disorder currently set forth in DSM-5 include:  (1) Preoccupation with playing and/or using video games; (2) Withdrawal symptoms (sadness, anxiety, irritability, and/or other unpleasant symptoms) when access to play and/or use is removed, precluded, or reduced; (3) Tolerance - the need to spend more time playing and/or using video games to satisfy the urge and desire to do so; (4) Loss of Control or the inability to reduce video game playing and usage time and/or unsuccessful attempts to quit gaming; (5) Giving up other activities or loss of interest in previously enjoyed activities due to compulsion to play video games; (6) Continuing to play and use video games despite negative or problematic consequences; (7) Deceiving family members or others about the amount of time spent playing and/or using video games; (8) Using video games to "escape" or relieve negative moods, such as guilt or hopelessness; and (9) Jeopardized school or work performance or relationships due to playing and/or using video games.

18.  **DEFENDANTS** placed into the stream of commerce certain Products that were intentionally designed to be as addictive as possible to those who use them, particularly to minors.

---

[4] Other disorders found in that subcategory include alcoholism and gambling addiction.
[5] It is also recognized in the recently released Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSM-5-TR).

**DEFENDANTS** did so despite having actual and/or constructive knowledge of the risk of harm their Products posed to users and their families, because of the addictive design features.

19.    Plaintiff A.G., and minors similarly situated, did not start using **DEFENDANTS'** Products with any knowledge or reason to think they could ever develop an addiction or disordered compulsion to using them. Nor, of course, did Plaintiff A.G.'s parents, or other parents similarly situated, have any such knowledge or reason to think the same.

20.    **DEFENDANTS** acted with intent to cause minors, including Plaintiff A.G., who used their Products, to develop an addiction or disordered compulsion, and had knowledge that such an addiction or disordered use could occur. **DEFENDANTS** purposely developed their Products to incorporate addictive design features, artificial intelligence (AI), and operant conditioning systems to cause the user to develop an addiction or disordered compulsion to use them. **DEFENDANTS'** intent was realized: Plaintiff A.G. developed an addiction and/or disordered compulsion to using their Products and, as a result, the **DEFENDANTS** generated profits from their wrongful and tortious actions.

## **NATURE OF THE ACTION**

21.    Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

22.    This action seeks to hold the **DEFENDANTS** accountable for causing and contributing to a global epidemic of children suffering from an addiction or disordered compulsion to use the **DEFENDANTS'** Products, an addiction and/or disordered use that triggers an extraordinary sequela of catastrophic and life-altering injuries to both the user and their families. The **DEFENDANTS** caused and contributed to creating such injuries and damages by participating in placing into the stream of commerce Products which were defective and unreasonably dangerous in that they were specifically designed and intended to cause users, specifically minors, to develop an addiction or disordered compulsion to using them.

23.    Plaintiffs' injuries and damages, legally and proximately caused by the **DEFENDANTS'** participation in placing their defective, unreasonably dangerous Products into the stream of commerce,

include but are not limited to: anxiety, irritability, depression, DSM-5 diagnostic symptoms present, sleep deprivation, loss of friends at school, and gamer's rage/aggression upon withdrawal.

24. The **DEFENDANTS'** defective and unreasonably dangerous Products are used by millions of minors and young adults, many of whom like Plaintiff A.G. began playing as young children, who either have developed an addiction or disordered desire to using the products or at severe risk of developing that harm. Their addiction is like any other addiction that consumes the life of an addict and harms the addict's loved ones. The Products cannot be removed or restricted from the person addicted to using them without risking that the individual will engage in self-harming behaviors or otherwise suffer physical, mental, and emotional withdrawal symptoms that require professional intervention and support.

25. This action arises from the **DEFENDANTS'** brazen resolve to deny, in the face of abundant scientific evidence to the contrary, that their Products pose a risk of danger to the user. The **DEFENDANTS** have always known that representing their Products as safe was untrue because they purposefully caused the Products to be designed with addictive qualities and features with the intention of causing users to want to use the Products more and more.

26. This is an action for personal injuries rooted, in part, in strict product liability based upon defective design and failure to warn. The design defects of the Products were present in the Products when they left the hands of the **DEFENDANTS**, were not reasonably safe for ordinary consumers to use, and were particularly unsafe for minors, because they contained addictive features intended to cause the user to want and then need to use the Products more and more, until the user develops an addiction or disordered compulsion to use the Products. The warning defects of the Products are reflected in the complete absence of any warnings directed to minor users and/or their caregivers regarding the risk of severe harm from using the Products in a reasonably foreseeable manner, including severe physical, mental, and emotional injuries and harm caused by addicted and disordered use thereof, all of which were known to the **DEFENDANTS** at the time they placed the Products into the stream of commerce, and which were unknown to the intended and foreseeable users and their parents, including Plaintiffs herein. There is no warning to anyone about the risks described herein that are posed by **DEFENDANTS'** Products.

27.    This is an action for personal injuries rooted, in part, in negligence arising from the **DEFENDANTS'** participation in placing their defective, unreasonable dangerous Products into the stream of commerce and into the hands of Plaintiffs herein, Products that included no warning of the dangers associated with their use for their intended purpose and as reasonably foreseeable, risks for which the **DEFENDANTS** had a duty to disclose to the consuming public but which they did not disclose, and which resulted in causing serious injuries to Plaintiffs. The **DEFENDANTS** knew, or in the exercise of ordinary care should have known, that their Products would be harmful to a significant percentage of minors who used them because those Products were intentionally designed to incorporate and employ addictive design features. The **DEFENDANTS**, despite that actual or constructive knowledge, failed to (by choosing to not) redesign their products to ameliorate the potential harms posed by the Products, and failed to warn users or the parents of users who are minors of the risks posed by the Products.

28.    This is an action for personal injuries rooted, in part, in common law negligence arising from the **DEFENDANTS'** breach of their duty to either warn or otherwise disclose to consumers the dangers posed by their Products, a duty which is heightened with respect to minors. The **DEFENDANTS** either knew or should have foreseen the likelihood of risk of harm posed by the dangers of using their products and the breach of their duty to disclose or warn of those dangers caused severe harm to the Plaintiffs herein.

29.    This is an action for personal injuries rooted, in part, in the tort of false representation as well as in intentional tort, including fraudulent deceit, deceit, and concealment. The **DEFENDANTS** made material omissions of fact designed to lull potential users of their Products, and caregivers of minor users, to have no concern in using their Products and to trust that they were safe to use when done so in a reasonably foreseeable manner. The **DEFENDANTS** placed user safety below their own profits. The **DEFENDANTS** made untrue expressions of fact or suggestion of fact which Plaintiffs and the public relied upon, expressions **DEFENDANTS** knew were untrue and did not believe to be true and had no reasonable ground for believing to be true. The **DEFENDANTS** suppressed and concealed facts regarding the dangers posed by their Products they knew or should have known to be true and which they had a duty to disclose to Plaintiffs, and those similarly situated as Plaintiffs. The

1   **DEFENDANTS** expressly and impliedly represented to members of the general public, including

2   purchasers and users of the products, including Plaintiffs herein, that their Products were of

3   merchantable quality and safe for foreseeable use. Plaintiffs relied upon those representations in

4   purchasing the products and allowing their minor child to use those products, when all the while the

5   **DEFENDANTS** knew that their representations and expressions of product safety were untrue.

6        30.   This is an action for personal injuries rooted, in part, in the tort of concert-of-action arising

7   from the **DEFENDANTS'** knowledge that the other **DEFENDANTS**, and each of them, did commit

8   or were committing the wrongful tortious acts alleged herein, agreed to and did commit the wrongful

9   tortious acts alleged herein in concert with one another and/or pursuant to a common design, gave

10   substantial assistance and encouragement to one another to engage in such conduct which, separately

11   considered, constituted a breach of duty to the Plaintiffs. The **DEFENDANTS**, in pursuing a common

12   plan or design to commit the tortious acts as alleged herein, and in actively participating in the tortious

13   acts, and in lending aid or encouragement to the wrongdoing, and/or in cooperating with the

14   wrongdoer, thereby ratified or adopted the other **DEFENDANTS'** acts done for their collective

15   benefit, and as such each of the **DEFENDANTS** is equally liable for each of the other

16   **DEFENDANTS'** tortious acts or failures to act.

17        31.   The **DEFENDANTS'** defective Products and tortious conduct, as herein alleged, were the

18   actual and proximate cause of the injuries and damages Plaintiffs sustained.

19   ***The Products***

20        32.   The purpose and functionality of the Products is to provide a tangible mechanism for

21   digital, interactive play, skill building, and amusement, and thus consumption, just like any other toy,

22   game, or gadget used or played by humans.

23        33.   The purpose and functionality of the patented technologies of addictive design features

24   incorporated into the **DEFENDANTS'** Products—*i.e.*, an invention or idea of addictive design

25   culminating in the design features incorporated in the Products—is to allow the **DEFENDANTS** to

26   develop and place into the stream of commerce Products that cause a user to develop an addictive or

27   compulsive need to use the products which, in turn, generates revenue for the **DEFENDANTS**.

28

34.  The **DEFENDANTS** participated in placing into the stream of commerce, individually and in concert with one another, the defective, unreasonably dangerous Products. The **DEFENDANTS** participated by designing, developing, marketing, manufacturing, selling, failing to warn about, failing to instruct about, distributing, testing, patenting, licensing, assembling, packaging, labeling, preparing, and suppling and otherwise providing accessibility to consumers to use (hereinafter generally referred to as "placing into the stream of commerce") the Products.

35.  In this action, the defective, unreasonably dangerous Products include Minecraft and Fortnite, the patent-protected technologies of addictive designs features incorporated to each, as well as the mechanisms, systems, and/or devices through which users access and consume those products, including by way of example, consoles (*e.g.*, Xbox, Nintendo Switch, and PlayStation), primarily via these Products' online app stores (*e.g.*, Microsoft Store, PlayStation Store, and Nintendo eShop) and the Products' online cloud gaming networks (*e.g.*, Xbox Live, Xbox Network, Xbox Game Pass, and PlayStation Network).

36.  In this action, the defective, unreasonably dangerous Products also include Xbox One and its related products, PlayStation 4 and PlayStation 5 and its related products, Nintendo Switch and its related products, all of which use and include the patent-protected technologies of addictive design features, as well as mechanisms and systems of operant conditioning (along with illegally retained and/or obtained personal information of the players) to work in conjunction with the video games being played thereon and/or to market Products (*e.g.*, video games, virtual currency for use in video games).

37.  The above identified Products served as Plaintiff A.G.'s "gateway" Products: the first games that they experienced using and, as such, their entry into the world of using the Products.

38.  The **DEFENDANTS'** Products are mass manufactured and marketed products that injure consumers in ways that are not capable of being anticipated by the consumer / user (or in the case of minors who are users, by their caregivers).

39.  The **DEFENDANTS'** Products are defective in that they were negligently and intentionally designed to cause an intense dopamine[6] release in the user that is similar in magnitude to

---

[6] Dopamine is a neurotransmitter made in the brain that acts as a chemical messenger that communicates messages between one's nerve cells in the brain, as well as between one's brain and the rest of one's body. Dopamine serves as the

that experienced by drug use or gambling. The release of dopamine causes demonstrable physical, mental, and emotional responses in the human brain and body. This is especially true in minors and particularly true in neurodivergent minors, whose brains are still developing.

40.    The repetitive release of dopamine that was designed to and does occur in users (especially minors) of the Products when used as intended, create and reinforce dysregulated or dopaminergic neural pathways that propel the user to hyperfocus on using the products, first at an increasing rate and then with a compulsive desire until the desire to use the products is addictive or disordered. Dysregulated neural pathways trigger addictive, compulsive, and impulsive behaviors outside of the gaming world that cause life-altering impulsivity and inhibitory control behaviors that result in a myriad of physical, mental, and emotional disorders, and other injuries, including other addictions, withdrawal symptoms, maldevelopment of the brain's frontal lobe, dissociative behaviors, social isolation, damage or negative consequences to cognitive processes, attention disorders, severe depression, morbid obesity, and other harmful effects, all to the severe detriment and damage to the user; where, as here, the user is a minor child, the user's caretakers/family suffer severe emotional detriment and pecuniary damage.

41.    Neurodivergent children are particularly susceptible to the addictive features of the Products and the resulting injuries that can be caused by said products.

### _Defective Design: Operant Conditioning and Microtransactions_

42.    Upon information and belief, the **DEFENDANTS** engaged, employed, partnered, collaborated, followed, obtained access to, and/or otherwise contracted with, behavioral psychologists for the purpose of engaging in studies of what effect using video games that incorporated particular designs had on the brains of users, and particularly on users who are minors. Those studies revealed that Products designed to use and incorporate operant conditioning—a methodology that uses rewards and punishments to influence behavior and through which certain behaviors that are reinforced are more likely to be repeated and which typically involve and are geared towards behaviors affecting

---

brain's all-important "reward center" and plays a critical role in several body functions including attention, mood, pleasurable reward and motivation, sleep, learning, and movement.

one's environment—target the user's dopamine receptors that trigger the user's desire to hyperfocus on using and overusing Products.

43. Upon information and belief, the **DEFENDANTS**, relying upon those studies, created or causing to be created, and/or licensed or purchased, patented technologies and systems protecting inventions and ideas of addictive design features rooted and premised upon operant conditioning, and included, either negligently or intentionally, said addictive design features in the Products to cause users to develop a compulsion to use the Products.

44. Upon information and belief, the **DEFENDANTS** entered into licensing agreements with patent-holding entities, whether individually and/or in concert, and/or purchased the patents, and then incorporated into the Products the patented technologies of addictive design features that employ operant conditioning. As a result, the **DEFENDANTS'** Products create and reinforce in their users a compulsion to use the Products until that use develops into an addiction or disordered compulsion that causes negative consequences, injuries, harm, and damages to the user and where, as here, the user is a minor child, damages and harm to the user's caretakers.

45. The patent-protected operant conditioning methodology incorporated into the Products is presented in various forms (e.g., feedback loops and reward systems) and makes the Products progressively more stimulative, which results in significantly maximizing a minor's usage time and increases the user's desire to use the Products.

46. The longer a user engages in playing **DEFENDANTS'** Products, the more money the **DEFENDANTS** generate.

47. Upon information and belief, the **DEFENDANTS** intentionally or negligently incorporated the addictive design features into the Products, despite knowing the risks and dangers they pose, with the intent of causing users to use the Products more and more, so that the **DEFENDANTS** would generate more money. The **DEFENDANTS** succeeded in doing both, all at the expense of the brains and bodies of the users, and at the expense of the mental and financial health of caretakers of minors, who wanted to use the Products they thought were safe, because they were reassured that they were safe, even though they were unreasonably dangerous.

///

48.   Microtransactions refer to the exchange of real money for in-game downloads, items, or perks. Microtransactions are inextricably tethered to the operant conditioning methodology incorporated into the Products that are designed to addict users, minors in particular, because the more one uses the Products, the more microtransactions the user will necessarily engage or participate in. All of this occurs by design of the **DEFENDANTS**: the **DEFENDANTS** engineered the Products to addict users so that the users will use the products more and therefore have to engage in microtransactions, and then more and more microtransactions, and spend real money at an increasing pace and rate until the spending is out-of-control because the user has developed an addiction or disordered compulsion to using the Products.

49.   Microtransactions were designed to and do exploit operant conditioning features to ensure and repeatedly trigger the impulsive behavior of users within the gaming environment, one that brings its own peer pressure, to drive in-game purchases. Microtransactions are a wildly successful monetization scheme – the **DEFENDANTS** have reaped incredible financial profit from microtransactions. The desire and need to engage in microtransactions in minors who have an addiction to, or disordered use of, the products, triggered by operant conditioning features, is all but irresistible to users.

50.   Upon information and belief, the **DEFENDANTS** relied upon the addictive design feature of operant conditioning incorporated into the Products to efficiently trigger corresponding microtransactions. Engagement with microtransactions is a necessary aspect of using the Products and is critical to the **DEFENDANTS'** ability to generate money on an ongoing basis.

51.   Microtransactions are the culmination of the **DEFENDANTS'** extensive cost-benefit business decision whereby they resolved to prioritize their already astronomical profits over the health and well-being of consumers, specifically minors whose brains are most easily affected by the addictive qualities of their Products and who are similarly the most vulnerable to the risk of harm the products pose.

52.   The more one uses the **DEFENDANTS'** Products, the more the user succeeds in developing an addiction or disordered compulsion to using the Products. The more the user uses the Products, even in the face of experiencing severely negative consequences to their health or

relationships, the more the user is motivated by the operant conditioning methodology with which the Products are designed that trigger their microtransaction engagement. The more microtransactions the users engage, the more money the **DEFENDANTS** generate.

53.   Reasonable minors who use the **DEFENDANTS'** Products, and reasonable caregivers of such minors, do not and have no reason to expect that the Products are psychologically and neurologically addictive.

54.   At all times material hereto, it was and is feasible for the **DEFENDANTS** to develop and place into the stream of commerce Products that are not designed to be addictive to their users by resolving to incorporate in those Products a patented technology that does not include addictive design features and is not intended to cause addictive or disordered use– after all, there are video gaming products on the market that do not include such addictive design features.

55.   At all times material hereto, it was and is feasible for the **DEFENDANTS** to warn consumers of the addictive design features of their Products.

56.   At all times material hereto, it was and is feasible for the **DEFENDANTS** to reduce the negative consequences and risk of danger their unreasonably dangerous Products pose to users, especially to minors, by limiting the frequency and duration of access to the Products. By way of example, the **DEFENDANTS** could incorporate design features that suspend access to the Products during sleeping hours or design software that limits the frequency and duration of cross-play of the products. Such features and others like them are feasible in that they could be accomplished at negligible cost, whereas the benefits that would result to the consuming public and particularly minors who are users, would be significant to their physical and mental wellness.

57.   The **DEFENDANTS**, upon information and belief, negligently, intentionally, and recklessly, incorporated microtransactions as a necessary part of the design of the Products with the goal of financially capitalizing upon the foreseeable consequences of employing operant conditioning methodologies on users, particularly the minors to whom the products are directly marketed.

///

///

///

*Defective Warning: No Warning of the Products' Known or Knowable Dangers*

58.   The catastrophic harm, injuries, and damages caused by the use of the **DEFENDANTS'** Products is extremely dangerous to the health and welfare of users and, when minors, their families.

59.   Upon information and belief, from the inception of when the **DEFENDANTS** conceptualized the idea of developing and designing their Products, at no time did the **DEFENDANTS** warn the general consuming public, inherently including Plaintiffs herein, of the defects, dangers, and risks of using their products, particularly those to minors; instead, and despite acknowledgment of a diagnosable gaming disorder by the World Health Organization and the American Psychiatric Association, the **DEFENDANTS** continue to insist that the Products are safe.

*The Conduct: Negligent, Intentional, and Reckless, Individually and in Concert*

60.   This action arises from each of the **DEFENDANTS'** negligent, intentional, and reckless conduct in their participation, individually and/or in concert with one another, in placing into the stream of commerce and marketing specifically toward minors, including Plaintiff A.G., the Products that are defective and unreasonably dangerous as herein alleged.

61.   The **DEFENDANTS** had actual and/or constructive knowledge or awareness of the defects, dangers, and risks that their Products posed to users, and specifically to minors, but nonetheless continued to put those Products into the stream of commerce without providing any warnings of the dangers they posed, including into the hands of Plaintiffs herein, all the while knowing that the consuming public (including Plaintiffs) did not know of and had no reason to suspect of the dangers the foreseeable use of the products posed to users and particularly to children.

*Plaintiffs' Injuries and Damages Caused By Plaintiff A.G.'s Use of the Products*

62.   The Products placed into the stream of commerce by the **DEFENDANTS** directly and proximately caused catastrophic personal injuries to Plaintiff A.G. and their parent, Co-Plaintiff MELISSA BLACK, as a result of Plaintiff A.G.'s foreseeable use of the Products.

63.   Plaintiff A.G.'s use of the Products was done in a reasonably foreseeable manner and for their intended purpose.

64.   Plaintiff A.G.'s use of the Products resulted in a disordered, compulsive, and addictive overuse just as the products were engineered and designed to cause, and without any warning of that

design and risk. As a result of Plaintiff A.G.'s use of the Products, they developed the following physical and mental injuries including: anxiety, irritability, depression, DSM-5 diagnostic symptoms present, sleep deprivation, loss of friends at school, and gamer's rage/aggression upon withdrawal.

65. The **DEFENDANTS**' participation in placing into the stream of commerce the defective Products was the actual and legal cause of the harm and damages suffered by Plaintiffs.

66. The **DEFENDANTS**' participation, individually and in concert with one another, in placing the defective Products into the stream of commerce, and specifically into the hands of Plaintiffs herein, was negligent, intentional, deceptive, fraudulent, willful, and reckless. Because that participation was the legal and actual cause of Plaintiffs' injuries, Plaintiffs are entitled to recover compensatory damages in an amount according to proof and to punish the **DEFENDANTS** for their wrongful conduct in placing into the stream of commerce Products designed to be addictive to the user, to the extreme detriment to the user, including Plaintiff A.G., in a manner that was and is malicious, wanton, willful, oppressive, and done with reckless indifference to both the Plaintiffs and the public's safety and welfare.

## **PARTIES**

67. Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

### *The DEFENDANTS*

68. **DEFENDANTS** in this action are EPIC GAMES, INC.; MICROSOFT CORPORATION; MOJANG A.B.; NINTENDO OF AMERICA, INC.; SONY INTERACTIVE ENTERTAINMENT LLC; and the FIRST DOE through ONE HUNDREDTH DOE, inclusive, *i.e.*, the **DEFENDANTS**, one or more of which are corporations and/or limited liability companies and/or legal partnerships and/or entities incorporated, organized, and existing under and by virtue of the laws of the State of California, or the laws of some other state and/or foreign jurisdiction and which have the authority to do business in this State, and/or are headquartered in this State, and/or have a principal place of business in this State, and/or are doing business in the State of California, and all of which regularly conduct business throughout the State of California, such that each of the **DEFENDANTS**

1   has sufficient minimum contacts in California, and which also regularly do business in Alameda

2   County.

3          69.   At all times herein mentioned, the **DEFENDANTS**, and each of them, was the successor,

4   successor in business, successor in product line or a portion thereof, parent, subsidiary, wholly or

5   partially owned by, or the whole or partial owner of or member in an entity that designed, developed,

6   tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed,

7   supplied, and/or sold the PRODUCTS, specifically including those used by Plaintiff A.G., and all of

8   which the **DEFENDANTS** put into the stream commerce in a defective condition, whether in design

9   or warning, whether negligently, intentionally, recklessly, or otherwise, that could, and did as to

10  Plaintiff A.G., cause disordered or addicted use to their and their Co-plaintiff's severe damage. Said

11  entities shall hereinafter collectively be called "alternate entities."

12         70.   Each of the **DEFENDANTS** and their alternate entities are liable to Plaintiffs for placing

13  the PRODUCTS into the stream of commerce and into Plaintiff A.G.'s hands to their detriment, and

14  to their family's severe injury, detriment, and damage and also because the **DEFENDANTS** and their

15  alternate entities either knew, or should have known, were aware or should have been aware, that the

16  products were defective and unreasonably dangerous in that they incorporated addictive design features

17  that can cause the user to suffer a myriad of severe physical, mental, and emotional injuries to users,

18  particularly minors.

19         71.   Each of the **DEFENDANTS** and their alternate entities is liable for the tortious conduct

20  of each successor, successor in business, successor in product line or a portion thereof, assign,

21  predecessor, predecessor in business, predecessor in product line or a portion thereof, parent,

22  subsidiary, alter-ego, whole of partial owner, or wholly or partially owned entity, or entity that it as a

23  member of, or funded, that designed, developed, tested, patented, assembled, manufactured, packaged,

24  labeled, prepared, distributed, marketed, supplied, and/or sold the defective Productts  that caused

25  injuries as herein alleged to Plaintiffs.

26         72.   The true names and capacities, whether individual, corporate, associate, governmental, or

27  otherwise, of defendants **FIRST DOE** through **ONE HUNDREDTH DOE**, inclusive, are unknown

28  to Plaintiffs at this time and Plaintiffs therefore sue said defendants by such fictitious names. When the

true names and capacities of said defendants have been ascertained, Plaintiffs will amend this Complaint accordingly. Plaintiffs, upon information and belief, alleges that each Defendant designated herein as a DOE is responsible, negligently or in some other actionable manner, for the defective products and conduct herein alleged, for the injuries and damages proximately caused thereby to Plaintiffs.

73.    Upon information and belief, and at all times herein mentioned, each of the **DEFENDANTS**, except as otherwise alleged, was the agent, servant, employee and/or joint venturer of the other **DEFENDANTS**, and each of them, and at all said times, each of the **DEFENDANTS** was acting in the full course and scope of said agency, service, employment, and/or joint venture.

74.    Upon information and belief, the **DEFENDANTS** committed the wrongful tortious acts alleged herein individually and agreed to and did commit the wrongful, tortious acts alleged herein in concert with one another, *i.e.*, the other **DEFENDANTS**, and/or pursuant to a common design with the other **DEFENDANTS** and/or with the knowledge that the conduct of one or more of the other **DEFENDANTS** constituted a breach of a duty and gave substantial assistance or encouragement to said others to engage in such conduct, and/or gave substantial assistance to the others in accomplishing a tortious result with each of the other **DEFENDANTS'** individual conduct which, separately considered, constitutes breach of duty to the Plaintiffs. As such, the **DEFENDANTS**, in pursuing a common plan or design to commit a tortious act, in actively participating in a tortious act, and in lending aid or encouragement to the wrongdoing, and/or in cooperating with the wrongdoer, thereby ratified or adopted the other **DEFENDANTS'** acts done for their collective benefit, and as such is equally liable for each of the named other **DEFENDANTS'** tortious acts or failures to act.

### *Defendant Epic Games, Inc.*

75.    Defendant Epic Games, Inc. ("Epic Games") is a Maryland corporation with its principal place of business in the State of North Carolina. Epic Games is authorized to do business in the State of California, and does business in the State of California, and its registered agent for service of process is CT Corporation System at 330 N Brand Blvd., Glendale, California, 91203. At all times material hereto, Epic Games is a video game and software developer which designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied,

and/or sold the Fortnite video game series either directly or indirectly to members of the general public within the State of California, including to Plaintiffs.

76.    At all relevant times, Epic Games acted in concert with Microsoft, Sony, and Nintendo to distribute, market, supply, and/or sell the Fortnite Products here at issue, and all in-game downloadable products and upgrades and in-game purchases contained therein, in an effort to increase its and the other **DEFENDANTS'** revenue at the expense of consumers, including Plaintiffs.

### *Defendant Microsoft Corporation*

77.    Defendant Microsoft Corporation ("Microsoft") is a Washington corporation with its principal place of business in the State of Washington. Microsoft is authorized to do business in the State of California, and does business in the State of California, and its registered agent for service of process is CSC – Lawyers Incorporating Service at 2710 Gateway Oaks Drive, Sacramento, California 95833. At all times material hereto, Microsoft designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Xbox video game consoles, including Xbox One, either directly or indirectly, to members of the general public within the State of California, including to Plaintiffs.

78.    Microsoft, in addition, and at all times material hereto, designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, and/or supplied the Xbox Network (formerly known as Xbox Live), Xbox Game Pass, and Xbox Cloud Gaming, which are available product features designed for use with the Xbox gaming console system, to members of the general public within the State of California, including to Plaintiffs.

79.    At all times material hereto, Microsoft (independently and/or in collaboration with its video game design and development studio division, Xbox Game Studios, and Mojang) designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Minecraft video game series, either directly or indirectly, to members of the general public within the State of California, including to Plaintiffs.

80.    Microsoft acted in concert with Epic Games, Mojang A.B., and Sony to distribute, market, supply, and/or sell the Fortnite and Minecraft Products here at issue, and all in-game downloadable

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

products and upgrades and in-game purchases contained therein, in an effort to increase its and the other **DEFENDANTS'** revenue at the expense of consumers, including Plaintiffs.

### *Defendant Mojang A.B.*

81.    Defendant Mojang A.B. ("Mojang") is a Swedish Company with its principal place of business in Stockholm, Sweden. At all times material hereto, Mojang designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Minecraft video series, either directly or indirectly, to members of the general public within the State of California, including to Plaintiffs.

82.    Mojang is a wholly owned subsidiary of Microsoft, who acquired Mojang and the Minecraft intellectual property for $2.5 billion in September 2014, and Microsoft is responsible for any damages that may be assessed based on Mojang's wrongdoing in connection with Minecraft.

83.    Mojang acted in concert with Microsoft and/or Sony in designing, developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, supplying, and/or selling the Minecraft for use and play by consumers with addictive features and technologies included therein as alleged herein.

84.    Mojang acted in concert with Microsoft, Sony, and Nintendo to distribute, market, supply, and/or sell its Minecraft Products here at issue, and all downloadable products and in-game purchases contained therein, in an effort to increase its and the other **DEFENDANTS'** revenue at the expense of consumers, including Plaintiffs.

### *Defendant Sony Interactive Entertainment LLC*

85.    Defendant Sony Interactive Entertainment LLC ("Sony") is a California company with its principal place of business in San Mateo, California. Sony is a wholly owned subsidiary of Sony Group Corporation, a Japanese company with its principal place of business in Tokyo, Japan. Sony Group Corporation is, upon information and belief, the sole member of Sony. Sony is authorized to and does business in the State of California, and its registered agent for service of process is CSC – Lawyers Incorporating Service at 2710 Gateway Oaks Drive, Sacramento, California, 95833. At all times material hereto, Sony developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Minecraft series, either directly or indirectly,

to members of the general public within the State of California, including to Plaintiffs. Sony, in addition, and at relevant times, manufactured, developed, and designed the PlayStation consoles and all products associated and related thereto, including PlayStation Store and PlayStation Network, to consumers in the State of California, systems intentionally designed to allow users of the Products to download and use the products, including Fortnite and Minecraft.

86. Sony, Mojang, and Microsoft acted in concert in designing, developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, supplying, and/or selling the Minecraft for use with Sony's Products, with addictive features and technologies included therein as herein alleged.

87. Sony acted in concert with Epic Games to distribute, market, supply, and/or sell Fortnite and all in-game downloadable products and upgrades and in-game purchases contained therein, in an effort to increase its and the other **DEFENDANTS'** revenue at the expense of consumers, including Plaintiffs.

### *Defendant Nintendo of America, Inc.*

88. Defendant Nintendo of America, Inc. ("Nintendo") is a Washington corporation with its principal place of business located in Washington. Nintendo is authorized to do business in the State of California, and does business in the State of California, and its registered agent for service of process is 66980 Yucca Drive, Desert Hot Springs, California 92240. Nintendo is a wholly owned subsidiary of Nintendo Co. Ltd., a Japanese company with its principal place of business in Kyoto, Japan. At all times material hereto, Nintendo designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Nintendo Switch console and the Nintendo eShop, either directly or indirectly, to members of the general public within the State of California, including to Plaintiffs.

89. Nintendo acted in concert with Epic Games and Microsoft/Mojang to distribute, market, supply, and/or sell the Products, including Fortnite and Minecraft and all in-game downloadable products and in-game purchases contained therein, to increase the **DEFENDANTS'** revenue at the expense of California consumers, including to Plaintiffs.

///

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

90.   The **DEFENDANTS**, individually and in concert with one another, participated, whether negligently or intentionally, in placing into the stream of commerce and to members of the general public within the State of California, and into the hands of the Plaintiffs, the defectively designed Products as herein alleged.

### *The Plaintiffs*

91.   Plaintiffs in this action are individuals, and are and were at all relevant times, residents of the United States, State of California, County of Alameda.

92.   Plaintiffs in this action are: MELISSA BLACK, the parent of Plaintiff A.G., and A.G., a minor child. A.G.'s interests in their causes of action in this action are represented by and through MELISSA BLACK.

93.   Plaintiffs in this matter have each suffered independent personal injuries and sequela thereto as a result of Plaintiff A.G.'s play use of the **DEFENDANTS'** defectively designed Products for their intended purpose and in a reasonably foreseeable manner.

94.   Plaintiff A.G. is, at the time of filing this action, seventeen (17) years old.

95.   Plaintiff A.G. began playing and using the **DEFENDANTS'** Products between the years of nine (9) and ten (10) years old and has continued to use the products at an increasing, uncontrollable, compulsive, and addictive pace since that time.

96.   Plaintiff A.G. used and/or uses Minecraft (beginning at approximately nine (9) years old) and Fortnite (beginning at approximately thirteen (13) years old).

97.   Plaintiff A.G. uses the **DEFENDANTS'** Products on multiple devices, and through multiple systems that fall within the definition of the "gaming products" as used herein, including the following: gaming consoles such as Xbox One, Nintendo Switch, PlayStation 4, and PlayStation 5. Plaintiff A.G. has also used the **DEFENDANTS'** Products via in-store purchases, free and paid subscriptions upon purchase of gaming consoles and via subscribing to Xbox Game Pass Ultimate and PlayStation Plus, which provides access to all games identified herein as well as Xbox's and PlayStation's online services through which the Products may be used.

98.   Plaintiff MELISSA BLACK seeks redress on her own behalf for economic and non-economic losses sustained as a result of their minor child Plaintiff A.G.'s compulsive, addictive use of

the **DEFENDANTS'** Products which has caused their addiction to video gaming, anxiety, irritability, depression, DSM-5 diagnostic symptoms present, sleep deprivation, loss of friends at school, and gamer's rage/aggression upon withdrawal, all to Plaintiffs' severe harm, injury, and damages. The defective Products here at issue, and the **DEFENDANTS'** participation and/or conduct in placing into the stream of commerce said products, and including into the Plaintiffs' hands, was the actual and legal cause of their harm, injuries, and damages to Plaintiffs as alleged herein. The **DEFENDANTS'** conduct as herein alleged likewise actually and proximately caused the injuries, harm, and damages suffered by Plaintiffs.

99. Plaintiff A.G.'s use of the defective Products for their intended purpose and in a reasonably foreseeable manner that were negligently and intentionally designed to create disordered and addictive overuse in users, did so create in them a disordered, compulsive, and addictive desire and need to play with and use **DEFENDANTS'** Products at an increasing rate, to Plaintiff A.G.'s extreme detriment and to the exclusion of all other activities that they had previously engaged as a minor child.

100. Plaintiff A.G. rapidly became addicted to using the Products and said use was a substantial factor in causing their video game addiction and eventual anxiety disorder which occurred on or about May 5, 2017, as well as other injuries, including irritability, depression, DSM-5 diagnostic symptoms present, sleep deprivation, loss of friends at school, and gamer's rage/aggression upon withdrawal.

101. Despite the extensive efforts of Plaintiff A.G.'s parents, as well as other family members and adults in A.G.'s life, to limit the time A.G. was and is using Products, a combination of several factors rendered and continue to render those efforts futile in terms of achieving a lifestyle where A.G. is able to stop using the products without severe withdrawal symptoms, and/or for any sustainable period of time or otherwise function as A.G. did prior to when they began using the gateway Products as identified herein.

102. Among those factors is the fact that Plaintiff A.G. is and was a "video gaming addict" and thus exhibits compulsive, obsessive, and addictive behavior in their use of the products, an addiction proximately caused by **DEFENDANTS'** deceptive tactics and fueled  by the absence of parental controls and time-limit restrictions within the products here at issue along with the inclusion of cross-

play (the ability to use the same video gaming product on and/or via different mechanisms, devices, or systems), design features that gave the false appearance to Plaintiff A.G.'s parent that A.G. was playing far less than they actually were, and, finally, the **DEFENDANTS'** resolve to not provide a warning to the parent (and co-Plaintiff) of A.G. so as to disclose the addictive operant conditioning design incorporated into the Products so as to give them a meaningful opportunity to make an informed decision regarding the risks of using the products.

103. Plaintiff A.G.'s addiction to the Products occurred rapidly: within less than six (6) months of when they began using them. Currently, Plaintiff A.G. uses the **DEFENDANTS'** Products approximately twelve (12) hours per day. Plaintiff A.G. spends more time using the **DEFENDANTS'** Products than they engage in any other activity, including sleeping, socializing or spending time with their family, physically exercising, meeting their Individualized Education Program (IEP) grade requirements, or playing sports, and it is, because A.G. is an addict, the only activity A.G. desires to do and needs to do in order to avoid withdrawal symptoms.

104. Plaintiff A.G.'s addiction to using the **DEFENDANTS'** Products is compulsive and disordered and they are incapable of restraining themselves as are others around A.G. incapable of precluding them from using the products, and any attempt on their part to do so was and is met with severe withdrawal symptoms, anger, and rage that is injurious and harmful to A.G. and their parent, Co-Plaintiff.

105. Plaintiff A.G.'s addictive use of the **DEFENDANTS'** Products necessitates their need to chronically spend their parent's money, Co-Plaintiff herein, during and throughout the hours A.G. uses the products, at least, on average $100.00 per month. Plaintiff A.G. spends their parent's money in this way via gift cards to purchase in-game transactions and downloadable products that are available in and accessible through the **DEFENDANTS'** Products as well as through several subscription services through which the products are used, including Xbox Game Pass Ultimate and PlayStation Plus. Thus, while video gameplay is ostensibly "free", the spending of real money is integral to the ability of a player, like Plaintiff A.G., to use the Products for their full intended purpose and the microtransactions on which that money is spent are an integral part of the inextricable tether between operant conditioning and addictive behaviors that generate revenue for the **DEFENDANTS**.

106. Plaintiff A.G. has received varied forms of treatment for their disordered and addicted use of the **DEFENDANTS'** Products due to their parents' considerable and consistent care and efforts to help A.G., albeit at a significant financial cost. Plaintiff A.G., to that end, has received and continues to receive intensive psychiatric out-patient care, therapy, family therapy, and psychotropic medication. Plaintiff A.G. suffers physically, mentally, and emotionally from the injuries and harm caused by their use of the **DEFENDANTS'** addictive products.

107. Plaintiff MELISSA BLACK has suffered and continues to suffer severe emotional distress and pain and suffering arising from the injuries Plaintiff A.G. suffers as a result of their addictive and disordered use of the **DEFENDANTS'** Products.

108. Plaintiff MELISSA BLACK, in addition, has been economically damaged as a result of the financial loss they have suffered and continue to suffer and experience as a result of the injuries A.G. has suffered as a result of the **DEFENDANTS'** defective Products. Plaintiff A.G. uncontrollably spends their money via daily in-game spending. They have also incurred, and will continue to incur, economic damage via payment of additional treatment and assistance for Plaintiff A.G. and to manage their own ongoing injuries directly and proximately caused by A.G.'s use of the **DEFENDANTS'** defective products.

*__Plaintiffs and the DEFENDANTS: No Contract__*

109. None of the Plaintiffs knew that **DEFENDANTS'** Products were and are designed to be addictive and would likely harm their child if used as intended by **DEFENDANTS**; no Plaintiff ever agreed for Plaintiff A.G. to be harmed or exposed to addictive products and to the extent any Defendant claims Plaintiff A.G. attempted to accept an electronic term and condition clause by clicking buttons on a screen that reflected language A.G. did understand, read, or which were unconscionable, it has since been made voided by virtue of its unconscionability and the power of disaffirmance which is demonstrated and secured by the filing of the instant Complaint.

110. Plaintiff A.G.'s continued use of the **DEFENDANTS'** Products, even after the filing of the instant Complaint, to the extent there is such use, is compulsive and due to A.G.'s disordered compulsion and addiction to using the Products and cannot and does not serve as an affirmation of any contract, however hypothetical, between the Parties.

1     111. Moreover, each of the **DEFENDANTS'** terms of services or terms and conditions

2    document is a contract of adhesion that has no variation or negotiable terms prior to requiring signing

3    between and by the parties. Said terms of services and conditions unilaterally hinge the user's access

4    to the Products on accepting the terms and conditions such that failure or refusal by users to accept and

5    to continue to accept any new terms and conditions during the course of using the Products results in

6    a loss of access to the purchased products. Accordingly, any terms to which Plaintiffs may have agreed

7    prior to using any of the **DEFENDANTS'** Products are void and unenforceable. Moreover, because

8    the **DEFENDANTS'** Products were designed to and did cause Plaintiff A.G. to develop an addiction

9    or disordered compulsion to using the products, which in turn proximately caused their mental and

10   physical injuries and damages as herein alleged, any such terms and conditions and any other purported

11   contract or agreement between the parties to this Complaint are void as against public policy as an

12   individual cannot consent to harming a minor.

13                            **JURISDICTION AND VENUE**

14    112. Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if

15   repeated in full here.

16    113. This action alleges causes of action seeking relief arising under and pursuant to the laws

17   of the State of California, including, but not limited to, the allegation that as a direct and proximate

18   result of the **DEFENDANTS'** Products and their negligent, deceptive, fraudulent, willful, immoral,

19   reckless, unlawful actions and inactions, and representations and misrepresentations, including by

20   omission, Plaintiffs suffered and continues to suffer injuries and damages within the State of California

21   that exceed the sum or value of $75,000, exclusive of interest and costs.

22    114. The California Superior Court has personal jurisdiction over the **DEFENDANTS**.

23    115. The **DEFENDANTS** are corporations and/or entities that are citizens of the State of

24   California. They are organized under the laws of the State of California or have a headquarters or

25   principal place of business within the State of California and are thus "at home" in California; are

26   foreign corporations and/or entities authorized to do business in California and are registered as such

27   with the California Secretary of State; and are corporations and/or entities that are foreign, nonresidents

28   of the State of California that have sufficient minimum contacts in, to, and with California arising from

1   activities whereby they have purposefully and intentionally availed themselves to the benefits and

2   protections of the laws of the State of California, and the market of the State of California, and continue

3   to date to avail themselves in that manner, and with respect thereto, the controversy reflected in this

4   action is directly affiliated with, related to, and arises from said **DEFENDANTS'** contacts with the

5   State of California, such that the exercise of jurisdiction over each of the **DEFENDANTS** by the

6   California State courts is consistent with traditional notions of fair play and substantial justice and is

7   not only not unreasonable, would be and is both reasonable and proper.

8        116. The federal judicial district of the United States District Court in which the above-

9   captioned state court is located lacks subject matter jurisdiction over this action as it is currently

10  pleaded herein. There is no federal question and there is incomplete diversity of citizenship due to the

11  presence of one or more California defendants. Removal would be and is improper. Plaintiffs seek no

12  remedy under federal law and expressly disclaim all theories of recovery, if any, that may exist

13  exclusively under federal law.

14       117. Venue is proper in the above-captioned Court: a substantial part of the counts giving rise

15  to this Complaint occurred in Alameda County and because one or more of the **DEFENDANTS**

16  regularly conducts business in Alameda County.

17                               **GENERAL ALLEGATIONS**

18       118. Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if

19  repeated in full here.

20  ***The Video Gaming Industry***

21       119. A "video game" is an electronic device or system that engages users in interaction with

22  an interface or input device that generates visual feedback from a display device. The system presents

23  a form of structured conflict and resolves its uncertainty in unequal outcome. The system is "closed":

24  once engaged in the game, the user sets aside their rules for daily life and accepts the rules of the game

25  as the status quo. A "video game" is a device or system that stores recorded data or instructions

26  generated by the user and, by processing that data and instructions, creates an interactive game capable

27  of being used, played, and viewed via systems such as computers, consoles, or other technologies; this

28  definition of a "video game" applies to the **DEFENDANTS'** products.

120. The video gaming industry began slowly, taking more than 35 years to reach $35 billion; between 2007 and 2018, the industry grew significantly to $137.9 billion, and by 2023, the industry's revenue was $365.6 billion globally.

121. Early video game companies created games and sold them to the consuming public mostly through physical cartridges and discs or other "physical" or "hard copy" formats to be played on physical devices like a gaming console or computer. The costs of developing the game, and generating profits therefrom, were realized through the sale of the games over a period of time, and it was a long and slow method of generating profit.

122. In today's technologically sophisticated world, video games, like Fortnite and Minecraft, remain still available for purchase in hard copy formats, but they are also accessible for use via digital download through "app stores" and via online gaming networks and cloud gaming servers for use on physical devices, including gaming consoles, computers, mobile phones, and tablets.[7] Each video game utilizes the same gameplay mechanisms, designs, and technologies in its development and design regardless of whether a user obtains and/or accesses the product for use via a physical disc, digital download, online gaming network, and/or through a cloud gaming service.

123. Unlike early video games that were used and accessed much like traditional arcade video games via a one-time, one-purchase and/or intermittent, non-continuous format, the more sophisticated high-tech video games of today—games that are accessible for use via a number of mechanisms, devices, systems, and platforms, each of which is also a video gaming product as that phrase is herein defined—necessitate if not require a lengthy and ongoing if not continuous active participation during which time users are exposed to psychological techniques intentionally designed to control, manipulate, and exploit the user's brain, and a minor child user's developing brain, to trigger an intense desire to engage in increased game usage time and, therewith, in-game downloads and purchases.

124. Gaming consoles (*e.g.*, Xbox, PlayStation, Switch)—and each device's associated Products as described herein—are designed and developed to work in conjunction with and to enhance the design mechanics of the video games being played thereon.

---

[7] For example: Xbox, PlayStation, Switch, iPhone, Chromebook, Google Pixel, Android-based phone, Amazon Fire Stick, PC running Windows Operating System or MacOS system.

*__Monetization Schemes: Operant Conditioning and Microtransactions__*

125. Microtransactions are a critically important part of the patented technologies of design features used in the **DEFENDANTS'** Products: microtransactions are intended to generate profit at the expense of the health of the users.

126. Microtransactions are intentionally inextricably tethered to the operant conditioning mechanisms and design incorporated into the Products that create, cause, trigger, and reinforce a disordered, addictive, and compulsive use of the products at an increasing rate; to wit, the more someone, particularly a minor, uses **DEFENDANTS'** Products that include addictive design features borne from operant conditioning systems, the more that user engages in microtransactions which generate real revenue for the **DEFENDANTS.**

127. The tremendous growth of the video gaming industry is in large part due to the advent of in-game purchasing microtransactions and monetization schemes that work in tandem with addictive operant conditioning design features. The latter is intended to and does cause compulsive, addictive use of the Products, and the former capitalizes upon the user's addicted or disordered use of the products to generate money for the **DEFENDANTS.**

128. The **DEFENDANTS'** placed into the stream of commerce Products designed to allow, encourage, and target people to use the products. Those products were incorporated with psychologically addictive features, properties, and technologies, including, but not limited to, operant conditioning, ever-changing gameplay, microtransactions, social aspects, patented systems, illegally and/or improperly obtained personal information, and the use of algorithms to target users to purchase in-game downloads and other in-game products.

129. There is no meaningful disclosure of the inclusion of addictive mechanisms and microtransactions in the **DEFENDANTS'** Products at the time they are purchased so as to allow prospective users or their caregivers to make informed decisions as to whether using the products is desirable, appropriate, safe, or worth the potential risk.

130. Microtransactions first appeared in 2006 but did not prove to be a good profit-making model until devices, particularly mobile devices, became more powerful and access to the internet became more readily available such that users could access video games almost anywhere.

131. Microtransactions may be presented to users during gameplay through a custom store interface placed inside the game for which the items are being sold, in a device's "app store", or otherwise marketed by the **DEFENDANTS** as an upgrade, reward, or special event related to a video gaming product.

132. Unlike patches or updates, which are essential to remove bugs and enhance in-game experiences, are a non-essential component of Products. The **DEFENDANTS** plan microtransactions with great intention.

133. The **DEFENDANTS'** design and marketing strategy is rooted, in part, in the theory that the revenue from a microtransaction system will outweigh the revenue from a one-time-purchase game. That is because microtransaction spending can easily add up to hundreds, or even thousands, of dollars from an individual user. The microtransaction model is rooted in, if not dependent upon, the patented technologies of addictive design features that are incorporated into the Products, all of which are concealed from users to ensure revenue earned by the Products remain recurring for as long as the product is available for use. When the user has an addiction or disordered compulsion to using the products, the reoccurrence of revenue via microtransactions from the products is all but assured. The **DEFENDANTS** did or do license or own patented technologies of addictive design features incorporated into their Products.

134. Microtransactions were intentionally and specifically designed to work in tandem with the design of operant conditioning methodology, technique, and strategy, ensure and compound the impulsive behavior of users within the closed gaming environment and the pressure that drives in-game purchases. For example, placing a time limitation on a microtransaction offer may push a user to impulsively buy an item. Similarly, a user's desire to be the first among a group of friends to buy an in-game premium item or achieve a ranking may drive a user to make microtransaction purchases.

135. Microtransactions in video games are predatory monetization schemes that are essentially purchasing systems within the games that disguise or withhold the long-term cost of an activity until users are committed, both psychologically and financially. Those schemes—all of which the **DEFENDANTS** knowingly incorporate into the design features of the Products—use psychological mechanisms, behavioral psychology, and neuroscience to encourage repeated use and increased

spending by users, especially in populations like minors who are especially vulnerable to these tactics and which serve to deepen their disordered or addicted use. Such tactics may involve, either singularly or in combination, limited disclosure of the products, intrusive and unavoidable solicitations, and systems that manipulate reward outcomes to reinforce purchasing behaviors over skillful or strategic play.

136. The **DEFENDANTS** utilize many strategies to enhance and exploit the already predatory monetization tactics incorporated into the Products. Such strategies include: (a) The "near miss": convincing players via exciting animation, for instance, that they were very close to winning; (b) "Chasing": encouraging players to keep playing to get back any money they just lost; (c) "Fear of missing out": suggesting that a special prize is only available for a short amount of time and must be obtained within the small window; (d) "Exclusivity": suggesting that only a small number of a special prize are available so it must be obtained immediately; (e) "Entrapment": convincing players they are about to win, or they have invested enough to win, but if they stop playing they will miss out on the win; and (f) The "sunk cost effect": justifying continued expenditures in the game because of the amount a player has already spent.

137. An additional aspect of the predatory monetization of the **DEFENDANTS'** Products is the collection and use of individual user data to manipulate the nature and presentation of in-game purchasing offers in ways that maximize the likelihood of the user spending money. The Products are designed to be and are capable of tracking various user metrics and adjusting their design in automated ways to elicit in-game purchasing, including utilizing a minor's illegally obtained and improperly retained personal information and biometric data to target the user and exploit their personal data.

138. Such schemes exploit an information asymmetry between user and the **DEFENDANTS'** Products in that the game system knows more about the user of the products than the user can know about the Products. This allows the gaming industry, including the **DEFENDANTS**, to use its knowledge of the user's game-related preferences, available funds, and/or playing and spending habits to present in-game downloads and purchase offers that are predetermined to maximize the likelihood of eliciting the expenditure of real money.

///

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

139. When use of the **DEFENDANTS'** Products is linked to a user's social network pages, the **DEFENDANTS** are able to and do gather additional information about the user and then employ that information to target products and microtransactions to those users based upon their interests and preferences. The prices of in-game items may be determined by factors that are not disclosed to the users because the algorithm used is capable of considering an individual user's available funds and cost sensitivity as to certain items. In this way, the products incentivize continuous spending by the user.

140. Systems that dynamically adjust in-game item prices and value based on such individual user analytics, which were implemented by product developers to, primarily, serve monetary goals and which lack basic transparency to the user, may also have the potential to exploit certain types of vulnerable players under certain conditions. Critical to the **DEFENDANTS'** revenue, such continued schemes with little to no restriction on the amount of spending in the payment interface also make it easy for users who are minors to fail to understand the value of the actual money being spent which allows for more easeful and further, if not continuous and chronic, spending of real money.

141. A few specific examples of such predatory monetization schemes incorporated into the **DEFENDANTS'** Products include loot boxes, rubber-banding, and pay-to-win models.

142. A "loot box" is an in-game reward system that can be purchased repeatedly—with real money, of course—to obtain a random selection of virtual items. Loot boxes could contain items that give users an advantage in the game, or cosmetic or aesthetic items that can be used to customize characters or weapons. Loot boxes are essentially a lottery that provides a way for gaming developers to increase revenue through underage gambling. It is common knowledge that gambling addiction is a severe issue that carries big risk in playing lottery-style games, so combining such gambling aspects with the psychologically addictive traits of video games makes for a highly dangerous scheme to which users are highly susceptible and will easily succumb. Loot boxes are ultimately controlled by the gaming developers as well as the **DEFENDANTS** herein, meaning that the "prizes" obtained from such boxes are likely to be determined by algorithms and other factors considered in the design of the video games. Loot boxes result in high revenues for the **DEFENDANTS** because instead of a one-time purchase for the desired item, users may and typically do buy multiple boxes.

1    143. Rubber-banding is a monetization scheme used to ensure dynamic difficulty, or a

2    consistently challenging experience, irrespective of the user's skill level by, for example, matching

3    computer opponents to a given user's skill level. The **DEFENDANTS** rely upon the principle of

4    rubber-banding with microtransactions to ensure that the products' financial requirements are adjusted

5    to match the user's desire and capacity to use. If an item costs too much, the users of monetized games

6    cannot strategize to win and instead must decide between making in-game purchases or not using the

7    products at all, or potentially playing without paying, but doing so with significantly diminished in-

8    game capability, all of which generate feelings of frustration in the user, particularly a person with

9    disordered or addicted use; such technical sophistication in these purchasing systems aims to reduce

10    the user's uncertainty or reluctance when faced with purchasing decisions.

11    144. Pay-To-Win is a monetization scheme that is intended to and does incentivize users to use

12    the video gaming products more. Users who are willing to shell out more money get a disproportionate

13    advantage over other users, particularly if the items cannot be obtained for free. For example, users

14    who pay money in microtransactions may get access to certain capabilities such as access to shortcuts,

15    special characters with unique skills, or even special items. Such capabilities may make the games

16    impossible to beat by non-paying users. Games with such imbalances may prevent the non-paying

17    users from progressing or remaining competitive.

18    145. The **DEFENDANTS'** use of microtransactions, individually and in concert with one

19    another, is carried out with such efficiency that it resembles a choreographed collaboration. The

20    **DEFENDANTS'** target users with in-game downloadable content to purchase by using algorithms and

21    design features incorporated into the video gaming products which, in turn, results in profit to the

22    platform and/or system entities, likewise **DEFENDANTS** herein. In addition, and simultaneously, said

23    platform and/or system entities, including **DEFENDANTS** herein, collect data from users to target the

24    additional Products based on the user's gameplay and personal preferences outside the game, to wit

25    the user's other game play, social interactions, age, and the like, are relied upon.

26    146. The human population most vulnerable to the combination of **DEFENDANTS'**

27    microtransaction methodology and addictive operant conditioning design features are users who are

28    minors and/or neurodivergent. The **DEFENDANTS** know this, purposefully designed the Products to

exploit that vulnerable population, to their extreme injury and detriment, including Plaintiff A.G. Doing so has yielded the intended results: the **DEFENDANTS** have earned extraordinary financial revenue from this group of users as a result of placing their addictive products targeted to children into the stream of commerce.

147. The **DEFENDANTS** knew or were aware, or should have known and should have been aware, that the Products were dangerous and harmful to users, particularly minors, when used as intended and in a reasonably foreseeable manner. In fact, the **DEFENDANTS** intentionally caused and designed the video gaming products to most effectively cause users with still developing brains to become addicted or disordered in their desire to use the products. To that avail, upon information and belief, the **DEFENDANTS** employed behavioral psychologists and/or neuroscientists to develop products that incorporated design features premised upon psychological tactics engineered to keep users engaged in using the products for longer and longer periods of time.

148. The microtransactions and other technologies, designs, features, mechanisms, algorithms, artificial systems, and other systems, the **DEFENDANTS** incorporated into the Products was done so in a manner such that users (and, when users are minors, their caretakers) do not understand and have no way of understanding that their use of the products involves engagement with intentionally addictive design features that are physically damaging to their brains and bodies, and financially rewarding to the **DEFENDANTS**.

### *Patented Technology: Ideas and Inventions of Addictive Design Features Used in the Products*

149. In previous years, lopsided consumer video game monetization-related inventions, such as those identified herein, were patent ineligible. That period of time has since passed. There are now patents that protect ideas and inventions of design features that are incorporated into video games that are intentionally designed to cause addictive and disordered use of the products that specifically target one's brain, and particularly the brains of minors. The **DEFENDANTS** agreed to and did develop, individually and in concert with one another, and/or made available for or did purchase or license, or otherwise caused to be incorporated into their Products one or more of this type of patented addictive design feature. The addictive design features incorporated into **DEFENDANTS'** products causes

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

severe and irreversible injuries, harm, and damages to our society's most vulnerable members, *i.e.*, minors, all the while lining the **DEFENDANTS'** pockets with outrageous financial profit.

150. Several video gaming product developers have been granted patents of inventions and ideas that are designs that include intentionally incorporated addictive features and qualities which contribute to high risk consumer behavior as alleged herein.

151. The **DEFENDANTS'** individual and/or collective agreement—whether tacit, implicit, or explicit—to place into the stream of commerce Products that are mass-marketed to consumers, and particularly to minors, that incorporate patented technologies of addictive design features engineered to specifically target the brains of users, serves as the ground zero through which the **DEFENDANTS'** participation in placing the Products into the stream of commerce causes users to develop an addiction or disordered use of their products, a use which generates more and more real money for the **DEFENDANTS**. In so doing, the **DEFENDANTS** have masterfully engineered a process that allows them to generate gross amounts of money from users, specifically including children, who have developed an addicted or disordered use that the **DEFENDANTS** intended to cause.

152. The fact that one entity may "hold" a patent on a certain or specific idea or invention of monetized technology, *i.e.*, here the addictive design features of operant conditioning combined with microtransactions, does not mean that said design or a similar design or scheme cannot be incorporated into the video gaming products of another entity, including the **DEFENDANTS'** Products. It is common practice for gaming developers, specifically including **DEFENDANTS**, to utilize technology patented by other entities by entering into licensing agreements with the entity holding the patent, or to buy the rights to the patent outright.

153. The patented addictive design features incorporated into the **DEFENDANTS'** Products makes those products progressively more stimulative which significantly maximizes usage time and, consequently, increases a user's disordered use and/or addiction to using the products. For instance, feedback loops continuously add new in-game downloadable products and upgrades and use tactics to ensure users are creating habits in their gameplay such as by incorporating systems that allow the product to react to how well the user is using it in order to make the products more rewarding, or for the products that are more difficult in skill level to use, more challenging. In this way, a user's successes

are reinforced through positive feedback loops, while their increasing ability to overcome the core challenges presented by using the product is curtailed by negative feedback loops. Feedback loops enhance the user's experience by maintaining a consistent level of challenge throughout one's use of the video gaming products while still rewarding the user for their achievements, and makes the user desire to use the products more and more until they develop an addicted or disordered compulsion to so use and, naturally and inevitably, to spend more and more money as they continue their use.

154. The feedback loops, in addition to the other psychological properties and operant conditioning features and methodologies, artificial intelligence, algorithms, and other systems that are used by the **DEFENDANTS** and/or at play when the user uses the Products are designed to keep users continuously engaged. Those patented addicted inventions and ideas of addictive design features and other systems that are incorporated into or otherwise working in conjunction with the video gaming products are able to study the skill level and behavior of the user, including and even across social media platforms and website use outside of the Products. This results in the user being bombarded with solicitations to purchase additional in-game downloadable game content and/or loot boxes based upon psychological behavioral analyses that employ addiction methodology to seduce the user, particularly minors, to increase usage time and stay using. In that way, the feedback loops, and other operant conditioning techniques and predatory monetization schemes, work together with the user's engagement and use of the video gaming products and other online services and platforms to cause more and more use by users, all to the user's own detriment, and to the financial benefit of the **DEFENDANTS**.

155. The **DEFENDANTS**' decision and participation, individually and in concert, to place into the stream of commerce their intentionally addictive products has resulted in an extreme uptick of video gaming addicts and extreme gamers.

156. The **DEFENDANTS**' participation in placing into the stream of commerce the video gaming products that incorporate patented addictive design features are intended to and do contribute to high-risk consumer behavior. Entities that hold, develop, license or otherwise have an ability to incorporate patented technologies of addictive design features into the video gaming products, including **DEFENDANTS** herein, often seek to keep their intellectual property and/or the use of such

1    intellectual property confidential. There are thus very few objective, transparent, or complete accounts

2    of the precise nature of the monetization schemes employed in their Products. Nevertheless, several

3    patents shed light on the innovative video game monetization inventions and ideas intended to lure and

4    addict users of video gaming products, and which are upon information and belief incorporated into

5    the design and development of **DEFENDANTS**' products. By way of example:

6        a.  U.S. Patent No. 8,360,866 B2, assigned to Leviathan Entertainment, LLC, describes an

7            invention that targets users unable to complete a game scenario and encourages the user

8            to make in-game purchases when they face such a difficult scenario. This patented design

9            mechanism is an "upsell message" and "can be, for example, for an item that is useful in

10           overcoming the difficulty the player has encountered" Or "kill[ing] a particular monster .

11           . . or player character."

12       b.  U.S. Patent No. 20160005270-A1, assigned to Activision Publishing, Inc., is a

13           "matchmaking" patent that uses historical player data and analytics to create a system for

14           driving microtransactions in a multi-player game. This "matchmaking" patent is used in

15           video gaming products, like **DEFENDANTS** at issue here, and can be summarized as a

16           "system and method . . . that drives microtransactions in multiplayer video games. The

17           system may include a "microtransaction arrange match" to influence game-related

18           purchases. For instance, the system may match a more expert/marquee player with a junior

19           player to encourage the junior player to make game-related purchases of items

20           possessed/used by the marquee player. A junior player may wish to emulate the marquee

21           player by obtaining weapons or other items used by the marquee player." The system for

22           driving microtransactions  comprises of a host computer having one or more physical

23           processors programmed with computer program instructions that, when executed by the

24           one or more physical processors, cause the host computer to: identify an in-game item that

25           is relevant to a first player, but not yet possessed by the first player for gameplay in a

26           multi-player game; identify a second player that possesses the in-game item; and match

27           the first player and the second player to play in a gameplay session to encourage purchase

28           of the in- game item by the first player, wherein the matching is based on: (i) the relevance

of the in-game item to the first player, and (ii) the possession of the in-game item by the second player. This system is further programmed to determine that the first player has purchased the in-game item in relation to the gameplay session; determine a subsequent gameplay session that caters to use of the in-game item; and match the first player to play in the subsequent gameplay session to encourage future purchases.

c. U.S. Patent No. 10,099,140 B2, assigned to Activision Publishing, Inc., describes a "customized messaging campaign for [a game] player" and allows messages to be "customized for a gamer based on their or her behavioral data" such as "level of interest or satisfaction with a game." Triggers for such messages may include "a player winning or losing a predetermined number of games in a row" and may include "promotions relating to microtransactions or downloadable content."

d. U.S. Patent No. 9,789,406 B2, assigned to Activision Publishing, Inc., modifies the difficulty of multiplayer matches to encourage microtransaction purchases. Specifically, the game identifies "an in-game item that may be relevant for (i.e., of interest to) a first player," then locates "a second user that has acquired (i.e., purchased), used, or otherwise possesses the in-game item." Matchmaking variables are then tuned such that the first player and second user are matched in a gameplay session.

e. U.S. Patent No. 9,623,335 B1, assigned to Kabam, Inc., utilizes a "user spend parameter value" to "determine which users should be provided with access to an exclusive virtual section of the online game." This prevents the game from losing the opportunity "to extract additional value from users inclined to spend money."

f. U.S. Patent No. 9,138,639 B1, assigned to Kabam, Inc., describes a system which modifies the "pricing of in-game virtual items associated with [players'] experience and their progress in the game." In this way, "while all players may receive a message for a particular item, the cost for each player may be more or less than other players based on the individual's in-game statistics."

g. U.S. Patent No. 8,702,523 B2, assigned to Microsoft Corporation, was created to capitalize on a player's tendency to commit to a purchase after investing significant time

into a trial version of a game. In short, a user is made "aware of an opportunity to add an achievement to their collection by downloading and playing a demo or trial version of a particular game," but "[i]nstead of recording the achievement" upon completion, the game "initiates a notification to the user . . . that the achievement will not be recorded unless they purchase the full version of the game at that time." More specifically, with Microsoft's patent:

    i.   Game play achievements for a free trial version are tracked and maintained even if the console is not connected via a network to the server so that when, and if, the console is eventually connected to the server, the achievements saved locally (*e.g.*, on the console hard drive, on an associated memory unit, etc.) are uploaded and become automatically discoverable to other online users playing the game on different consoles.

    ii.   The machine license, a component of the patent, allows any user on the console access to the downloaded game product, including all game components and product-content, regardless of the console's connection to the internet or the existence of parental controls.

h.   U.S. Patent No. 9,795,886 B1, assigned to Electronic Arts, Inc., allows new users to purchase in-game support more cheaply than experienced users. Particularly, the system determines "prices for a protection extension in an online game" based on "the user's power and/or strength in a game." This allows a less experienced player to "build up their strength in a game, thus promoting further player engagement."

i.   U.S. Patent No. 10,252,170 B2, assigned to Hasbro, Inc., encourages players to make purchases outside of a game to receive in-game benefits and allows players to earn in-game points for scanning codes that come with separately purchased physical toys. For instance, the patent allows the developer using the patent in their video game design to stay connected with the user by requiring a user to keep their "avatar" charged by earning points by scanning codes on toys, through continued game use, or engaging in real world activities, thereby creating an endless video game running on a mobile electronic device

that allows a player to use continuously as long as the user earns points playing the game, which is enhanced to allow the user to earn points by creating input from real environment activities, such as by scanning a code on a physical object or by producing activity related data from athletic activity.

j.  U.S. Patent No. 10,569,171 B2, assigned to Disney Enterprises, Inc., associates a gaming device with a "video game application that is associated with media content, such as a television show broadcast by a television network and displayed on a television." Such device "captures, *e.g.*, from a microphone of the gaming device, an audio signal from the media content being played concurrently with the video game application" and "uses content recognition techniques to identify the media content, unlocks 'premium' in-game content that augment gameplay of the video game application."

k.  U.S. Patent No. 9,582,965 B1, assigned to Kabam, Inc., incentivizes users to alter virtual item balances in an online game. A game may specify "target balances of virtual items to be reached in user inventories" and may specify "a time by which such target balances must be reached." For instance, the player may be given a goal of reaching a target balance of 3,000 gems within 48 hours to receive a premium virtual item. The player has the option to use real-world money to buy gems to earn that goal. After the 48-hour time period passes, another goal may be set that specifies a target maximum balance of 1,000 gems, encouraging users to spend the newly acquired gems that were just purchased.

l.  U.S. Patent No. 9,403,093 B2, assigned to Kabam, Inc., encourages users to make purchases on multiple game platforms by providing incentives for such "cross platform game play." In particular, "[t]he system may monitor the player's performance on a particular console and provide incentives to accomplish tasks through game play on a different platform than the player is currently operating the play the game."

m.  U.S. Patent No. 9,626,475 B1, assigned to Kabam, Inc., facilitates a time-limited event-based currency. During such an event, players may acquire a second type of virtual currency in addition to other forms of virtual currency. The event-based currency may be purchased with real-world money, and after the event, the event-based currency may

1    become unusable by or unavailable to the users.

2    n.  U.S. Patent No. 9,666,026 B1, assigned to Aftershock Services, Inc., provides offers that

3         "decrease in value based on previous acceptances of the offers" in order to create a sense

4         of urgency in relation to the virtual items. Offers provided "may include a first offer

5         having a first value that progressively decreases based on an amount of users that have

6         previously accepted the first offer in order to incentivize early acceptance of the offer."

7    o.  U.S. Patent No. 9,808,708 B1, assigned to Kabam, Inc., adjusts "virtual item bundles

8         made available to users of an online game based on user gameplay information." This

9         allows the game to increase the price of an item bundle for a user with less cost sensitivity

10        associated with items that the user enjoys.

11   p.  U.S. Patent App. No. 20160346677 A1, assigned to Electronic Arts, Inc., but currently

12        abandoned, describes a system which provides "[a]pproaches to facilitating chance-based

13        wait time reductions." Essentially, such a system would allow users to spend money to

14        reduce waiting periods that may or may not be disclosed at the time of sale.

15   q.  International Application No. PCT/US2019/042697, a pending patent application filed by

16        Sony Interactive Entertainment, LLC, would patent technology that suggests

17        microtransactions to players who are stuck in the game to keep them engaging and playing

18        the video game. More specifically, this patent would collect and "process[] game data of

19        the player for determining a current state and process[] game data of other players that

20        have completed the objective" in order to suggest to the player what "downloadable

21        content (DLC), add-ons, upgrades, items, tips, strategy, communal data" or otherwise

22        would be useful to the player to complete their objective. The patented method further

23        includes operations for identifying successful attempts of completing the objective by

24        other players and the resources used in doing so, selects a resource that is usable by the

25        player to complete the objective based on those resources by the other players in the

26        successful attempts, and presents the resource to the player for immediate use. *See also*

27        US 202000030702A1, filed July 24, 2020.

28   157. In addition to the above, the Products function based in part upon algorithms intended to

and which do manipulate the type of use a person using the product has. For instance, video game developers hold patents, which the **DEFENDANTS** license to use and incorporate into the Products, that provide a framework of artificial intelligence to monitor, analyze, and control the usage and to increase usage time and to fuel microtransactions.[8]

158. Upon information and belief, the **DEFENDANTS**, and each of them, own and/or license one or more of the above technology patents, and/or others patents similar thereto, and incorporated said technology into the video game products with the intention of causing that patented technology to work as intended: to wit, to incorporate design features that cause addictive or disordered use of the video gaming products to cause the user to want to use more and more in a disordered compulsive unhealthful manner and to drive the microtransaction engagement that inevitably occurs with that use.

159. At all times material hereto, the **DEFENDANTS** targeted consumers/purchasers, including minors and specifically including Plaintiffs herein, to use the Products and to engage via microtransactions whereby in-game perks are exchanged for real money through in-game targeted solicitations.

160. Each of the **DEFENDANTS**, with knowledge of Plaintiff A.G.'s age and California residency, targeted A.G. and induced them into microtransactions during their use of the Products via and as a result of the addicted design features incorporated into the products. As a result of A.G.'s use of the **DEFENDANTS'** Products, A.G. and Co-Plaintiff herein were injured and damaged as herein alleged.

161. Microtransactions, many of which are generated as a result of the incorporation of addictive monetization schemes contained and incorporated in the design of the **DEFENDANTS'** Products, make up 30% of the total revenue earned across the video gaming industry. The revenue is split between the developer of the game itself (*e.g.*, Epic Games, Sony, or Microsoft/Mojang) and the developer of the systems, devices, and mechanisms which allow users to access and play the video gaming products (*e.g.*, Microsoft, Sony, and/or Nintendo) pursuant to licensing or other contractual agreements.

---

[8] By way of example, see Patents assigned to Activision publishing, Justitia, https://patents.justia.com/assignee/activision-publishing-inc (last accessed Oct. 29, 2023).

*The Video Gaming Products at Issue Herein*

*Fortnite: Epic Games*

162.  Fortnite, developed and published by Epic Games, was first released in 2017 and is now available in three distinct game mode versions that share the same general game design and engine.

163.  Fortnite: Battle Royale is a free-to-play battle royale game in which up to 100 users fight to be the last person standing. Users can play alone, in a duo, or in a "squad" of three to four players. When users land "inside the game," the user must scavenge for weapons, items, resources, and vehicles while trying to stay alive and attack and eliminate other users.

164.  Fortnite: Save the World is a cooperative hybrid tower defense-shooter and survival game in which up to four users fight off zombie-like creatures and defend objects with traps and fortifications they can build. Users are awarded a number of in-game items from and during missions, including hero characters, weapon and trap schematics, and survivors, all of which can be leveled up through gained experience to improve their attributes. Save the World is the only pay-to-play game mode of the Fortnite franchise.

165.  Fortnite Creative is a sandbox game mode in which users are given complete freedom to create worlds by spawning any item from Battle Royale on a personal island and can create games such as battle arenas, racecourses, platforming challenges, and more.

166.  Each of Epic's herein listed Fortnite products has similar graphics, art assets, and game mechanics.

167.  Battle Royale and Save the World are rated T for Teen—*i.e.*, recommended for individuals aged 13 and above. This does not mean younger children cannot use it or that Epic Games does not know that children under 13 are using its Fortnite video gaming products. Rather, Epic Games is aware and markets Fortnite to consumers of all ages, and particularly to children.

168.  Fortnite is also available for free download on multiple devices, including PlayStation and Switch, and can be played through Epic Games cloud gaming network, among others.

169.  Fortnite game products are monetized through the use of V-Bucks: in-game currency that can be purchased with real-world funds or earned through completing missions and other achievements in Save the World.

170.  Epic Games markets the sale of V-Bucks directly to the consuming public, both digitally and as physical gift cards to be purchased using real money.

171.  V-Bucks in Save the World can be used to buy loot boxes, in the form of llama-shaped pinatas, to gain a "random" assortment of items.

172.  V-Bucks in Battle Royale can be used to buy cosmetic items like character models or the game's battle pass: a tiered progression of customization rewards for gaining experience and completing certain objectives during the course of a Battle Royale season.

173.  Fortnite has an average of 239 million monthly players and a peak of 15 million players in a day.

174.  Less than two years after Fortnite's release in 2017, the games had generated over $9 billion in revenue through microtransactions and in-game purchases. In 2021 alone, Fortnite generated $5.8 billion in revenue.

175.  The addictive properties and design features, as alleged herein, of the Fortnite game products are so dangerous to users, and especially minors, that several health and behavioral centers across the country have published resources for parents specifically warning about Fortnite addiction. Several studies have concluded that Fortnite is "more addictive than heroin and other illegal drugs."

176.  Despite these third-party express warnings of the dangers of Fortnite, Epic Games has failed to disclose the risks of harm purposefully built into the Fortnite game products.

177.  Fortnite gained immense popularity because of its clever manipulation of human psychology. Epic Games designed and developed Fortnite games with the use of addictive operant conditioning to make users want to keep using the products more and more.

178.  The team that developed Fortnite includes psychologists, statisticians, analysts, and coordinators who worked for nearly four years to develop products that were as addictive as possible.

179.  One tactic Epic Games used with respect to the Fortnite game products is a psychological trick of "lose by a little, win by a lot" or the "near miss" effect.

180.  Simplistically explained, this occurs when the user loses a round of the game, the product ensures that user loses by only a slight margin, which compels them to play another round because they were so close to winning before. When the user loses, they rationalize their defeat and often tell

themselves that what stopped them from winning was the smallest mistake. As a result, the user wants to use the products more, just one more round, but they end up using the product more and more, not just once more. The "near miss" effect means that when the user perceives that they lost by only a slight margin, they do not actually have to win a round to feel the high of a win. This strategy lies in getting the users *close* to the feeling of winning, because when the user is close to winning, the user feels the same buzz and release of dopamine and goes on to play another and then more and more rounds. And, in addition, when the user does win a round, the user wins a lot of perks, giving them an increase in dopamine and the adrenaline rush to keeping using the product.

181.   In the hopes of increasing their rank in the Fortnite products through wins, users continue to use, often and increasingly without any pause, break, or rest.

182.   Fortnite game products use random reward tactics, including something referred to within the field of psychology as the "variable interval schedule," which is the idea that randomized small wins will continue to draw in users to use the products more and more.

183.   With each small win, the brain is rewarded with a small spurt of dopamine—no matter how random small rewards may be.

184.   The design of the Fortnite game products keeps users drawn in. The bright and vibrant colors and cartoonish representation of the game make it more appealing than other bleak multiplayer battle royale type products.

185.   Similarly, the mechanics of the Fortnite game products inject elements of variety, allowing users to find ideal hiding spots, loot drops, explore the entire map, build towers and forts using resources, and more. In designing and incorporating such mechanics and features, Epic Games ensures that users never once get bored while using the Fortnite products.

186.   To keep users even more engaged and using the Fortnite game products, Epic Games often rolls out updates that keep users busy with engaging and fresh features, new maps, live events, and the latest trends. Such updates can also remove minor glitches that may be problematic to users as well.

///

///

///

187.   Fortnite game products also keep users coming back for more and more by giving "Daily Quest" assignments that users can complete to earn V-bucks.[9]

188.   Users will thus continually log into the Fortnite game product to complete these quests and earn V-bucks for in-game spending.

189.   These features, combined with the ease of accessibility—the game is free to use on multiple video gaming products including several platforms and devices—fosters addiction in users and particularly minors and young adults because they draw users in and allow users to use Fortnite nearly anywhere at any time.

190.   Upon information and belief, Epic Games has licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in the Fortnite games.

191.   Epic Games does not disclose to the public or the users of Fortnite any of the psychological tactics or addictive features it purposefully incorporates into its products.   Instead, Epic Games touts its Fortnite game products as "educational" and markets them for use in the classroom.

192.   On its website, Epic Games even offers "Free Fortnite lesson plans" to educators on subjects ranging from history, geography, and programming:[10]



---

[9] https://fortnite.fandom.com/wiki/Quests_(Battle_Royale)

[10] https://dev.epicgames.com/documentation/en-us/fortnite-creative/education-in-fortnite-creative

193.   Engaging—and addicting—users who are children early and in environments such as their classroom increases Epic Games's revenue through continued use of its Fortnite products to young users, at the expense of these users' mental and physical health.

194.   Epic Games does not adequately inform, or inform at all, users of the inherent risks involved with using Fortnite game products, specifically including that Fortnite was designed to addict users to their extreme harm and detriment.

195.   Epic Games designed Fortnite with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including, but not limited to, brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

196.   Epic Games designed Fortnite to be as addictive as possible and with psychologically addictive features and tricks to ensnare game players, including, but not limited to, designing the game to include a "near miss" effect, loot boxes, random rewards, bright and vibrant colors, and continual gameplay variety.

197.   Epic Games designed Fortnite in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users.

198.   Epic Games, in connection with its Fortnite video game product, engaged and/or engages in the following conduct:

   a.   Deploying design tricks, known as dark patterns, to dupe millions of players (including minors like Plaintiff A.G.) into making unintentional purchases in its Fortnite game;

   b.   Failing to notify parents that children had open access to in-game purchases and to obtain consent prior to processing purchases;

   c.   Collecting personal data from children, including Plaintiff A.G., without first obtaining parents' verifiable consent despite being aware that many children were playing Fortnite;

   d.   Requiring parents who requested that their children's personal information be deleted to jump through unreasonable hoops, and sometimes failed to honor such requests;

e.  Utilizing default settings that enable live on-by-default text and voice communications for users and these default settings harm children and teens—and a violation of state or federal law because these default settings, along with Epic Games's role in matching children and teens with strangers to play Fortnite together, harmed children and teens, exposing children and teens to bullying, threats, harassment, sexploitation, and other dangerous and psychologically traumatizing issues such as suicide while on Fortnite;

f.  Tricking users, including minors like Plaintiff A.G., into making purchases while playing Fortnite. More specifically, Epic Games has deployed a variety of dark patterns aimed at getting consumers of all ages to make unintended in-game purchases. Fortnite's counterintuitive, inconsistent, and confusing button configuration led players to incur unwanted charges based on the press of a single button. For example, players could be charged while attempting to wake the game from sleep mode, while the game was in a loading screen, or by pressing an adjacent button while attempting simply to preview an item. These tactics led to hundreds of millions of dollars in unauthorized charges for consumers;

g.  Charging account holders, including Plaintiffs, without authorization and allowed minors, including Plaintiff A.G., to purchase in-game content without parental consent;

h.  Locking the accounts of customers who disputed unauthorized charges with their credit card companies; thereby revoking access to all the content they have purchased, which can total thousands of dollars and, even when Epic Games agreed to unlock an account, consumers were warned that they could be banned for life if they disputed any future charges; and

i.  Purposefully obscuring cancel and refund features to make them more difficult to find.

199.  Epic Games, independently and in concert with third-parties, engaged in the aforementioned deceptive, negligent, and intentional privacy violations and used the information garnered therefrom to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on and to trick minors, like Plaintiff A.G. into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

200.  Epic Games failed to disclose that it designed the Fortnite video gaming products with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm.

201.  Epic Games knew that its Fortnite video gaming products contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but instead of disclosing such harms, Epic Games marketed Fortnite as "educational" and safe for use by minors (inside and outside the classroom).

202.  Epic Games misrepresented Fortnite as educational and safe for use by minors, young adults, and neurodivergent individuals, including Plaintiff A.G., while knowing that abuse, addiction, and compulsive use by such product users can lead to brain damage and injury, and knowing that it had designed and developed Fortnite to be as addictive as possible.

203.  Epic Games did not inform and concealed from the public, including Plaintiffs, that Fortnite video gaming products pose significant risk of harm to users due to Epic Games' decision to design Fortnite to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to brain damage and injury in those individuals.

### *Minecraft: Mojang and Microsoft*

204.  Minecraft is a 3D sandbox video game first developed and published by Mojang, who made the video game available to the public in 2009, prior to a full release on November 18, 2011.

205.  Minecraft can be played on PC, various gaming consoles, and mobile devices.

206.  Since the first full release of Minecraft in 2011, the video game has been continuously updated with many major and minor product updates, including, but not limited to, gameplay-altering mechanics, new product content and items, microtransactions, and tweaks to existing product features, which are available free to users who have purchased the game.

///

///

207. In May of 2012, Mojang Studios and Microsoft, acting through its video game design and publishing studio, Xbox Game Studios, released Minecraft for play on Xbox 360 and as the flagship game to play with friends via Microsoft's new Xbox Live feature.

208. The Xbox 360 version of Minecraft, like the product versions that came later for play on other gaming consoles or updated Xbox consoles, differed from the personal computer version of Minecraft in many ways, including, but not limited to, a newly designed crafting system, the control interface, in-game tutorials, split-screen multiplayer, and the ability to play with friends over the internet.

209. With the introduction of Minecraft as a video game product for play on gaming consoles like Xbox 360, the Minecraft Defendants introduced microtransactions and made in-product downloadable content available for purchase.

210. All Minecraft versions since 2012 have been designed to include microtransactions and on-going product updates to enhance gameplay and keep players engaged in the product.

211. In December of 2013, Mojang Studios and Sony Interactive Entertainment, LLC released Minecraft for play on PlayStation 3.

212. Microsoft acquired Mojang Studios and all product rights to Minecraft in 2014.

213. That same year, Minecraft was made available for play on Xbox One and PlayStation 4.

214. In 2015, Minecraft was made available for play on the Wii U, which is a gaming console product designed, manufactured, and sold by Nintendo of America, Inc.

215. In May of 2017, Minecraft was made available to play on the Nintendo Switch, and then in September of 2017 for Nintendo 3DS.

216. On September 20, 2017, the Minecraft Defendants released a *Better Together Update* for Xbox One, Windows 10, VR (virtual reality gaming headsets), and mobile versions, which enabled cross-platform play between those products and became known as the *Bedrock Edition* of Minecraft.

217. The *Bedrock Edition* was also provided as a product update to the Nintendo Switch version of Minecraft in 2017, thereby enabling cross-platform use between the Nintendo Switch, Xbox One, VR, mobile devices, and personal computers.

///

218. In December of 2019, the PlayStation 4 version of Minecraft was updated to become part of the *Bedrock Edition*, thereby enabling cross-platform use for persons with Xbox Live accounts.

219. The *Bedrock Edition* of Minecraft is the most commonly available and played version of the product, allowing cross-platform play with Microsoft's Xbox One and Xbox Series X/S, Sony's PlayStation 4 and PlayStation 5, Nintendo's Switch, VG, mobile devices, and personal computers.

220. Minecraft is the best-selling video game to date, with over 300 million copies of its games sold.

221. Minecraft has over 163 million monthly active players.

222. Regardless of version or platform, Minecraft gameplay is designed with no required goals to accomplish, thereby allowing players extensive freedom in exploring virtually infinite terrain within a blocky, procedurally generated, three-dimensional world.

223. While there are no set goals, Minecraft does include an achievement system where players can earn "advancements" in the *Java Edition*, "trophies" when playing on PlayStation consoles, and "achievements" in *Bedrock Edition* and when playing on Xbox consoles.

224. Minecraft players can discover and extract raw materials, craft tools and items, and build structures and machines; however, the core gameplay revolves around picking up and placing block-objects in a 3D grid.

225. In Minecraft, the game world is virtually infinite on a horizontal plane and procedurally generated based on a players' exploration, using a map seed that is obtained from the system clock at the time of world creation.

226. Although a single video game product, Minecraft gameplay can be different each and every time a player logs in to play.

227. Minecraft includes multiple game modes for a variety of gameplay, including, but not limited to, survival mode, in which players must acquire resources to build in the world and maintain health, and creative mode, in which players have unlimited resources and access to flight.

228. Depending on the chosen game mode, players can fight hostile mobs or cooperate or compete against other players in the same world.

///

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

229.  When starting a new world, players must choose one of five game modes, as well as one of four difficulties, ranging from "Peaceful" to "Hard."

230.  Minecraft is easy for any player to play because it does not have a lengthy instruction manual or demo of the game to learn how to play.

231.  Each player's main task in Minecraft is to survive all the problems using specific resources.

232.  When a player uses the given resources to protect their territory and advance in the game, the player feels like they have accomplished something and can easily get addicted to that feeling.

233.  The Minecraft Defendants designed Minecraft with multiplayer options, allowing players to interact and communicate with each other in the game world, which combined with the technologies and algorithms built into the game product prays upon the chemical reward receptors of users' brains to create addictive engagement.

234.  These versions also allow children to enter and engage with others in dangerous "chat room" features throughout the game.

235.  On certain devices, Minecraft pushes constant notifications about new features, skins for avatars, and new objects in the games.  These notifications pop up on screen whether players are already playing Minecraft or not.

236.  These interactive features serve only to lure players to spend more time in the game.

237.  Once a player succeeds with one stage, they move on to the next one.  Essentially, Minecraft can last for eternity if the player is not strong-willed enough to stop playing.

238.  Minors and players with neurodivergent diagnoses, such as ADHD, can become easily hyper focused and addicted to building worlds within Minecraft.

239.  The Minecraft Defendants were aware of these propensities, and specifically developed their games along with psychologists and neuroscientists, to include addictive psychological traits.

240.  At the expense of users' mental and physical well-being, the Minecraft Defendants failed to inform the public, users, or parents about the risk of addiction and other negative consequences that can arise from gameplay.

///

241.    The Minecraft Defendants tout the game as educational and market it to educators for use in the classroom:



11

242.    The Minecraft Defendants offer teachers ready-built lessons and curriculums centered around their game:

12

243.    The Minecraft educational game products offered by the Minecraft Defendants to teachers and parents are built of the *Bedrock Edition* codebase and can be played on personal computers and tablets.

244.    The Minecraft Defendants fail to adequately inform users of the inherent risks involved with using and playing Minecraft or that the game was designed to addict and harm users.

245.    The Minecraft Defendants are aware that the more time a user plays the game, the more likely they are to continue purchasing in-game product upgrades.

246.    The Minecraft Defendants intend to introduce and addict as many users as possible to increase their own profits as these users continue playing—and spending—as they grow.

---

[11] https://education.minecraft.net/en-us
[12] https://education.minecraft.net/en-us

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

247.  The Minecraft Defendants have profited from the release of their addictive video game product to the public. For instance, in 2021, the Minecraft video game generated approximately $380 million across all different gaming platforms.

248.  Microsoft and Mojang have independently and in concert with each other and third-parties, engaged in the aforementioned deceptive, negligent, and intentional privacy violations and used the information garnered therefrom to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on and to trick minors, like Plaintiff A.G., into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

249.  Microsoft and Mojang designed Minecraft to take advantage of the chemical receptors in product user's brains and with addictive psychological features and traits to make the video game as addictive as possible, including, but not limited to, designing and developing a virtually infinite game world, multiple game modes and difficulty levels, short-term rewards, and options for new features, skins, and objects.

250.  Microsoft and Mojang designed Minecraft in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users.

251.  Microsoft and Mojang designed Minecraft with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including, but not limited to, brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

252.  Microsoft and Mojang failed to disclose that they designed Minecraft to include addictive features and psychological tactics to increase gameplay and product use, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage injury and, as such, the products pose significant risk of harm.

253.  Microsoft and Mojang knew that Minecraft contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but instead of disclosing such harms,

Microsoft and Mojang marketed Minecraft as "educational" and safe for use and play by minors (inside and outside the classroom).

254.  Microsoft and Mojang misrepresented the Minecraft games as safe for use by minors and young adults, while knowing they had been designed and developed with addictive psychological features to keep users playing Minecraft more often and for longer periods of time, and while knowing that abuse, addiction, and compulsive use by youth can lead to brain damage and injury, such that Minecraft poses significant risk of harm to users.

255.  Microsoft and Mojang did not inform, did not warn, and concealed from the public that they designed Minecraft games with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth can lead to brain damage and injury..

### *Xbox and Xbox Products: Microsoft*

256.  Xbox is a video gaming brand, owned and operated by Microsoft, that consists of Xbox gaming consoles, as well as video games and online video gaming through the Xbox network, Xbox Game Pass, and Xbox Cloud Gaming.

257.  Microsoft designs, develops, manufactures, produces, supplies, and sells Xbox video game consoles—and markets all Microsoft video game products—to consumers across the world, and specifically in California, and to Plaintiffs.

258.  Microsoft has manufactured and released five versions of its Xbox consoles: Xbox (1st Generation), Xbox 360 (2nd Generation), Xbox One (3rd Generation), Xbox Series X (4th Generation), and Xbox Series S (4th Generation).

259.  Microsoft released the original Xbox in North America in 2001, and a year later launched its integrated Xbox Live product to allow players to play video games online.

260.  When it was released in 2002, Xbox Live required a subscription for use but was a wild success due to features, including, but not limited to, a "buddy list" and access to popular online video games.

///

///

261. Microsoft released Xbox 360 in 2005, and with that release, launched an upgraded Xbox Live product that included, *inter alia*, a limited "Free" or "Silver" tier that allows users to play online video games for free.

262. Microsoft released upgraded and revised versions of its Xbox 360 console, the Xbox 360 S and Xbox 360 E, which provided hardware and software updates to the product.

263. Microsoft released Xbox One in North America in 2015.

264. In marketing Xbox One, Microsoft emphasized the console's internet-based features, including, but not limited to, the ability to record and stream gameplay, and the ability to integrate with a set-top box to watch television.

265. Microsoft also released upgraded and revised versions of Xbox One, known as Xbox One S and Xbox One X, which provided hardware and software upgrades to the product.

266. Microsoft released its fourth generation of Xbox consoles—Xbox Series X and Xbox Series S—in North America in 2020, with each model designed to be family playable.

267. Both the Xbox Series X and Xbox Series S (collectively, "Xbox Series X/S") consoles are fully compatible with all Xbox One games and most hardware as it is, backwards compatible with games playable on Xbox One from the Xbox 360 and original Xbox console.

268. To help transition Xbox One users to the newer Xbox Series X/S consoles, Microsoft designed and introduced a Smart Delivery system—a product that provides automatic free updates to Xbox One versions of games to the Xbox Series X/S versions for most of Microsoft's first-party games and several of its third-party games.

269. Each Xbox console provides users the ability to play video games by using a hard copy of the video game, a digital copy downloaded from Microsoft Store (also known as Xbox Games Store, hereinafter "Xbox Store"), using the Xbox Network (formerly known as Xbox Live), and/or using Xbox Game Pass Cloud Gaming.

270. Microsoft developed and maintains the Xbox Store—a product-platform through which users can purchase thousands of games to be stored on their console through digital download, and for use with its Xbox consoles.

///

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

271.  When a user purchases and downloads a game from either store, regardless of whether that is a first-party video game or third-party video game, all design elements and downloadable content for said games is stored on the users' Xbox console and, if connected to the Internet, will receive product updates released by the game developer.

272.  Microsoft markets the Xbox Store as "safer for the whole family" to use:



273.  Xbox Network is an online multiplayer gaming service created and operated by Microsoft for use with its Xbox consoles. It includes the Xbox Store and Xbox Game Pass Cloud Gaming. Xbox Network is available as a free and a paid subscription-based product, known as Xbox Game Pass. Xbox Game Pass Core, formerly Xbox Live Gold, is a paid tiered subscription service offered by Microsoft that provides users access to online games, multiplayer abilities, and other features.

274.  Xbox Game Pass Ultimate, the highest tier of paid subscriptions at $17 per month, provides product users the same benefits as the other tiers, but also provides users access to Xbox Game Pass Cloud Gaming (hereinafter "Xbox Cloud Gaming").

275.  Xbox Cloud Gaming is Microsoft's Xbox cloud gaming service. Xbox Cloud Gaming was initially released in beta testing in November of 2019, and launched for Xbox Game Pass Ultimate subscribers on September 15, 2020.

276.  Xbox Cloud Gaming operates by linking the device to a remote server in the cloud. Gameplay is saved in the cloud and can be accessed and used from numerous devices at any given location. In fact, Xbox Cloud Gaming allows for gameplay from a number of devices—no longer is a

console required. The thousands of games in the Xbox Cloud Gaming library are extensive and everchanging, which keeps players coming back to either finish a game before it disappears or check for new and exciting game options to play and use Microsoft's Xbox video gaming products and other video gaming products, including Fortnite and Minecraft, through the Xbox Network and Xbox Cloud Gaming. This means that anyone with an Xbox Cloud Gaming account can access and play any game on their Xbox console, computer, or mobile device.

277. Once a game is downloaded to the user's Xbox console or made available on the Xbox Network, Microsoft provides video game developers and publishers a framework to initiate and process in-game purchases and microtransactions through the Xbox Store and Xbox Cloud Gaming.

278. This framework enables game developers to sell microtransactions and/or loot boxes through Microsoft's video game products, as described herein.

279. In exchange, Microsoft keeps a percentage of all revenue generated by these microtransactions and in-app purchases.

280. Microsoft specifically designed its Xbox video game products to attract users to purchase games and in-game products therein—regardless of the content such games may include.

281. Xbox Game Pass Ultimate also offers users daily, weekly, and monthly "quests" that can be completed for varying amounts of Microsoft Reward points:

## How it works

Xbox Game Pass Ultimate and Console plan members can earn Microsoft Rewards points by playing games from the Xbox Game Pass library. Here's how to get started.

**1.**

**Browse current Quests**

Check out current Quests on your Xbox console in the Xbox Game Pass section or on your Xbox Game Pass mobile app. New Quests are added every day.

**2.**

**Participate in Quests**

Find the list of Quests in the Xbox Game Pass membership area on your Xbox console or on the Xbox Game Pass mobile app. You will receive an instant notification when your Quest is ready to be turned in.

**3.**

**Claim and track your points**

Go to the Xbox Game Pass area on your Xbox console or on your Xbox Game Pass mobile app to claim and track your points.

**4.**

**Redeem points**

Head to the Microsoft Rewards app to spend your points. Redeem points for Xbox gift cards and use for in-game content, games, devices, movies, apps, accessories and more.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

282.  The ease of access, quest challenges, and constantly evolving game library draws players in, and keeps them coming back.

283.  Over 20 million people have played video games using Xbox Cloud Gaming.

284.  Xbox Cloud Gaming allows these users to connect with each other by including a feature to add and interact with friends, called "Xbox Social." This social media-akin feature permits users to add friends to a Friends list and then see what games your friends are using and/or invite them to join your game.

285.  The Xbox Network, including, but not limited to, Xbox Cloud Gaming, is designed to allow Xbox users and video game users to chat with each other individually or in groups.

286.  To find friends, users are encouraged to link to other social media accounts with their Xbox subscription.

287.  Minors and young adults are, therefore, encouraged to log-in more often and for longer periods to keep up with their friends, engage and play with friends, and compete with friends within the games.

288.  Upon information and belief, Microsoft hires behavioral psychologists and neuroscientists to design its Xbox consoles, Xbox Network (and all products and features thereof), video games, and marketing in the best way possible to attract users, especially minors, young adults, and neurodivergent individuals.

289.  Microsoft is aware that several of the video games available for play on the Xbox, and available for download in the Xbox Store and Xbox Cloud Gaming, are designed to continuously encourage users to purchase in-game products, to be addictive, and pose unreasonable risk of harm to users, particularly minors and neurodivergent individuals.

290.  Microsoft does not adequately inform users of the inherent risks involved with using its products or that the products—along with the games being played thereon—were designed to addict and harm users.

291.  Microsoft markets its own video game products and video game products manufactured, designed, and developed by third-parties, including the sale of virtual currencies and product upgrades for those products; to wit, Microsoft markets and sells Xbox/Fortnite and Xbox/Minecraft "bundle"

1  products; V-Bucks, and Minecoins are marketed and sold in both digital and physical gift card forms

2  to be used on and with Xbox products.

3      292.  Microsoft designed its Xbox Products identified herein with addictive features and for use

4  with addictive video game products, with addictive features to be used with its Xbox consoles and as

5  a product to house and to purchase addictive video game products, to take advantage of the chemical

6  reward system of users' brains, and these addictive features include, but are not limited to, an

7  everchanging, constantly rotating library of games to ensure players keep coming back to finish games

8  before they are removed or check for new and exciting game options to play, and social aspects that

9  allow users to play with and view the games played by friends and other users.

10     293.  Microsoft designed its Xbox consoles with addictive features and for use with addictive

11  video game products and designed its Xbox Network and other Xbox Products described herein, with

12  addictive features to be used with its Xbox consoles and as a product to house and to purchase addictive

13  video game products.

14     294.  Microsoft targeted users to make purchases of addictive video game products, while

15  knowing that abuse, addiction, and compulsive use by youth and young adults can lead to brain damage

16  and injury, including, but not limited to, dissociative behavior, withdrawal symptoms, social isolation,

17  negative consequences on cognitive processes, and other harmful effects.

18     295.  Microsoft designed its Xbox consoles, Xbox Network, Xbox Store, Xbox Game Pass

19  Ultimate, Xbox Cloud Gaming, and other Xbox video gaming products by employing and/or with the

20  help of and/or in conjunction with psychologists, neuroscientists, and other behavioral experts to

21  ensure the minor and young adult users continually purchase and use addictive video gaming products.

22     296.  Microsoft failed to disclose that it designed its Xbox consoles with addictive features and

23  for use with addictive video game products, and designed its Xbox Network and Xbox Products with

24  addictive features to be used with its Xbox consoles and as a product to house addictive video game

25  products, to take advantage of the chemical reward system of users' brains and to purchase addictive

26  video game products, while knowing that abuse, addiction, and compulsive use by foreseeable users,

27  *i.e.*, minors, can lead to injury and, as such, the products pose significant risk of harm.

28

297.   Microsoft knew that its Xbox consoles and other Xbox Products contained an inherent risk of abuse, addiction, and compulsive use by youth, young adults, and neurodivergent users—and the harms that arise therefrom—but do not disclose such harms anywhere and instead market its products for play by such users.

298.   Microsoft misrepresented that its Xbox Products, including those used by Plaintiff A.G., were safe for use by minors, young adults, and neurodivergent people, while knowing that it was designed and developed with addictive features to keep such users using Microsoft's video game products, playing video games, and purchasing addictive content, and while knowing that abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals can lead to brain damage and injury, such that Microsoft's video game products pose significant risk of harm to users, including Plaintiff A.G.

299.   Microsoft knew that its Xbox consoles and Xbox Products, as well as the Minecraft games, contained an inherent risk of abuse, addiction, and compulsive use by youth, young adults, and neurodivergent people, and the harms that arise therefrom, but intentionally marketed its products for use by such individuals and directed its misstatements towards users of those games and other games that were designed and developed, utilizing the patents and technology described herein.

300.   Microsoft did not inform the public that it designed its Xbox consoles and its Xbox Products with addictive features, or that these products could be used to download addictive video gaming products, despite knowing that abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals can lead to brain damage and injury and those products were designed to cause addictive and compulsive use.

301.   Microsoft, in connection with its Xbox game consoles and Xbox Products, engaged and/or engages in the following conduct:

    a.   Collecting personal information from children who signed up to its Xbox gaming system without notifying their parents or obtaining their parents' consent, and by illegally retaining children's personal information;

    b.   Allowing children, after creating an account on Xbox, to create a profile that will include their "gamertag," and allowing them to upload a picture or include an avatar, which is a

1    figure or image that represents the user, which Microsoft then combines with a unique

2    persistent identifier it creates for each account holder, even children, to share with third-

3    party game and app developers;

4    c.  Allowing—by default—all users, including children, to play third-party games and apps

5    while using Xbox Game Pass, requiring parents to take additional steps to opt out if they

6    do not want their children to access them; and

7    d.  Using the data collected on minors less than 13 years old to use a patented system of

8    analyzing gamer behavior, tracking kids with their respective gamer tag, and using a

9    deceptive marketing of in-game purchases or prepaid cards to ensure minors remained

10    engaged in the games which proximately caused the addiction and/or internet gaming

11    disorder.

12    302.  Microsoft has independently and in concert with third-parties, engaged in the

13    aforementioned deceptive, negligent, and intentional privacy violations and used the information

14    garnered therefrom to analyze the gaming and purchasing behavior of minors and design game releases

15    tailored to prey on and to trick minors, like Plaintiff A.G., into buying microtransactions or

16    unknowingly make in-game purchases using the game patents and other illegal dark patterns.

17    ***PlayStation and PlayStation Products: Sony***

18    303.  PlayStation is a video gaming brand, owned and operated by Sony, that consists of

19    PlayStation gaming consoles and handhelds, as well as video games and online video gaming through

20    the PlayStation Network and PlayStation Plus.

21    304.  Sony designs, develops, manufactures, produces, supplies, and sells PlayStation video

22    game consoles—and markets all Sony video game products—to consumers across the world, and

23    specifically in California, and to Plaintiffs.

24    305.  Sony has manufactured and released six versions of its PlayStation consoles: PlayStation,

25    PS one, PlayStation 2, PlayStation 3, PlayStation 4, and PlayStation 5.

26    306.  Sony released the original PlayStation in North America in 1995.

27    ///

28    ///

307.  Sony designed and developed PlayStation as part of a partnership or joint venture with Nintendo, with the key design feature being a built-in CD-Rom drive to increase load speeds and provide better graphics, along with other technologies, for more engaging video game play.

308.  Sony released a redesigned version of the original PlayStation, PS one, in 2000, with the primary redesign being the home menu's Graphical User Interface.

309.  Concurrently with the release of PS one, Sony released PlayStation 2 ("PS2").

310.  Sony designed PS2 to be backwards-compatible with most original PlayStation games.

311.  PS2 was designed to allow users to play select video games online, through a third-party server, using an add-on network adaptor sold by Sony for use with the PS2.

312.  In 2004, Sony released a redesigned PS2 Slimline—the first PlayStation console to include a built-in Ethernet port to allow users to play select video games online without need for a separate adaptor.

313.  In 2005, Sony announced their intent to create and build their own PlayStation server so that its product users could constantly be in touch with the PlayStation World.

314.  Sony launched its PlayStation Network in March of 2006.

315.  Sony released PlayStation 3 ("PS3") in North America in November of 2006, featuring redesigns of the hardware and software components including, but not limited to, the introduction of motion-sensing technology through its wireless controller, a Blu-Ray Disc player, and high-definition resolution.

316.  In marketing PS3 to consumers, Sony used the tagline "Never Stop Playing."

317.  Sony released its PlayStation 4 ("PS4") in North America in November 2013.

318.  Sony marketed PS4 as "pushing the boundaries of Play."

319.  PS4 is not compatible with any video game discs used with older PlayStation consoles, such that PS4 users must purchase new games in order to use PS4.

320.  Sony, and its partner video game designers and developers, distribute and sell PS4 games at retail stores on Blue-Ray Disc and digitally as downloads through the PlayStation Store

321.  All PS4 games must be installed to the console's storage.

///

1    322.  PS4 has a built-in "PlayGo" feature that allows users to begin to play portions of a game

2    (such as opening levels) once the installation or download reaches a specific point, while the remainder

3    of the game is downloaded or installed in the background.

4    323.  When a user has connected their PS4 to the internet, Sony and its partner game designers

5    and developers automatically update games and system software in the background and while the

6    console is on standby.

7    324.  PS4 gaming consoles feature Wi-Fi and Ethernet connectivity, Bluetooth, and other built-

8    in technologies that make game play more interactive and immersive.

9    325.  In designing and developing the PS4, Sony focused on social interaction capabilities and

10    integration with other devices and video game products, including the ability to play games off-console

11    on PlayStation Vita (a handheld game console) and other supported devices (known as "Remote Play"),

12    and the ability to stream gameplay online or to friends with them controlling game play remotely

13    (known as "Share Play").

14    326.  PS4 is designed to allow users to not only play video games with and against one another,

15    but also includes a live streaming feature.

16    327.  Live streaming allows users to watch live gameplay of other users through the PS4

17    interface with cross-game camera and microphone input, to spectate silently (*i.e.*, without camera or

18    voice input), or to broadcast their own gameplay live via DailyMotion, Twitch, Ustream, Niconico, or

19    YouTube Gaming, during which friends or members of the public can view and comment upon the

20    user's game play from any device.

21    328.  In releasing PS4, Sony also redesigned the game controller to make it easier for users to

22    utilize these features and engage in social gameplay.

23    329.  In designing PS4, Sony used technology similar to personal computers to make it easier

24    and less expensive for game studios, including its own, to develop video games for PS4.

25    330.  Sony sells and markets add-on video game products for use with PS4, including

26    PlayStation VR and PlayStation Camera, as a means for consumers to further utilize the built-in social

27    gaming features and to enhance their video gaming experience.

28    ///

331.  Sony also released the PlayStation App in conjunction with the PS4, which allows PS4 owners to turn a smartphone or tablet into a second screen to enhance gameplay.

332.  In 2015, Sony released PlayStation Now, a cloud-based video game distribution product that allows users to purchase PS3 games (individually or by subscription) for play on the PS4.

333.  Sony released its PlayStation 5 ("PS5") worldwide on November 12, 2020.

334.  PS5 was designed to provide users with fast loading times and a larger bandwidth to make games more immersive and to support all features (including microtransactions) built into video games.

335.  PS5 was also designed with a completely new user interface but is backwards compatible with most PS4 and PlayStation VR games.

336.  PS5's main hardware features include a solid-state drive, customized for high-speed data streaming to enable significant improvements in storage performance, an AMD GPU capable of 4K resolution display, hardware-accelerated ray tracing for realistic lighting and reflections, the Tempest Engine for hardware-accelerated 3D audio effects, a DualSense controller with haptic feedback, and other upgraded features that make game play more interactive and immersive.

337.  PS5 is available in two models: a base version with an Ultra HD Blu-Ray compatible optical disc drive for retail game support alongside online distribution via the PlayStation Store, and a lower-cost variant lacking the disc drive and retaining digital download support.

338.  Like PS4, users are required to install all video games on the PS5 console in order to play the game.

339.  In marketing PS5 and its features, including the DualSense controller, Sony told consumers "you need new devices to experience what these developers want you to experience."

340.  For use with its PlayStation consoles and games, Sony designed, developed, and maintains the PlayStation Network.

341.  PlayStation Network allows users to participate in online multiplayer gaming and to purchase video games and other video game products through the PlayStation Store.

///

///

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

342.  Sony developed and maintains the PlayStation Store—a product through which users can purchase and download thousands of games, including Minecraft and Fortnite:



[13]

343.  Once a game is downloaded, Sony provides a framework to initiate and process in-game purchases and microtransactions through the PlayStation Store.

344.  This framework enables game developers to sell microtransactions and/or loot boxes through the PlayStation Network.

345.  In exchange, Sony keeps a percentage of all revenue generated by these microtransactions and in-app purchases.

346.  Another product Sony makes available on its PlayStation Network is PlayStation Plus ("PS Plus"), a paid tiered subscription service offered by Sony that provides users access to online multiplayer games.

347.  PlayStation Plus offers three membership plans, each with different features and costs.

348.  The "Essential" tier offers users monthly downloads of PlayStation games as well as the ability to play online multiplayer games, for $9.99 per month.

349.  The "Extra" tier offers the same features as the Essential tier, but with access to the PlayStation Game Catalog of hundreds of games.

350.  Finally, the "Premium" tier provides the same features as the Essential and Extra tiers, but also provides access to the Classics Catalog and cloud streaming.

---

[13] https://store.playstation.com/en-us/pages/browse

65                    COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

351. PlayStation cloud streaming allows users to stream and play hundreds of PS5, PS4, and classic PlayStation games from any PS5 or PS4 console or computer.

352. Through PlayStation cloud streaming, downloadable video game products and in-game purchases are available for streaming—meaning that purchased products will be available on every device on which a user logs in to play.

353. PlayStation Plus cloud gaming operates by linking the devices to a remote server in the cloud. Gameplay is saved in the cloud and can be accessed and picked up at the same spot from numerous devices in any given location.

354. As of March 2023, PlayStation Plus had over 47 million subscribers. These subscribers are able to connect, add each other as friends, and chat through the PlayStation Network. This social media-akin feature permits users to add friends to a Friends list and then see what games your friends are playing and/or invite them to join your game.

355. Minors and young adult users of Sony's video gaming products are therefore encouraged to log-in more often and for longer periods to keep up with their friends, engage and play with friends, and compete with friends within the games.

356. Sony's latest tagline—"Play Has No Limits"—encourages users across the world, no matter their circumstances, to engage in limitless video game play.

357. Sony intentionally designed its video game products, described above, to attract users to purchase and play video games—regardless of the content or subject matter such games may include.

358. Upon information and belief, Sony hires behavioral psychologists and neuroscientists to design its consoles, games, products, and marketing in such a way to attract users, especially minors and young adults, and to keep them playing.

359. Sony is aware that its video game products, and the games playable thereon, that it sells and encourages users to continually purchase in-game product upgrades and microtransactions are addictive and pose unreasonable risk of harm to users, particularly minors.

360. Sony does not adequately inform users of the inherent risks involved with using its products or that the products—along with the games being played thereon—were designed to addict and harm users.

361. Sony markets its own video game products and video game products manufactured, designed, and developed by third-parties, including the sale of virtual currencies and product upgrades for those products; to wit, Sony markets and sells PS4/Fortnite "bundle" products and Minecoins are marketed and sold in both digital and physical gift card forms to be used on and with PlayStation products.

362. Upon information and belief, Sony utilizes the patented addictive technologies, systems, and mechanisms identified herein, operant conditioning techniques, and other improper means to collect user's data and market their Products to consumers, including Plaintiffs. Further, once a game or other video gaming product is downloaded to a user's PlayStation device and/or PlayStation account, the user is exposed to all features of that product (including all addictive mechanisms and systems included therein).

363. Upon information and belief, Sony provides video game developers (*e.g.* Microsoft/Mojang and Epic Games) a framework to initiate and process in-game purchases and microtransactions. This framework enables game developers to sell microtransactions and/or loot boxes through PlayStation Network and other PlayStation products, and while the consumer is playing the video game on their device. In exchange, Sony keeps a percentage of all revenue generated by product purchases, including all microtransactions and in-app purchases.

364. Sony, in connection with its PlayStation Products, engaged and/or engages in the following conduct:

    a. Collecting personal information from children who signed up to its PlayStation Network, PS Plus, PlayStation Store, and any other product within the PlayStation group without notifying their parents or obtaining their parents' consent, and by illegally retaining children's personal information;

    b. Allowing children, after creating an account on PlayStation, to create a profile that will include their "PSN"—a unique online ID—and allowing them to upload a picture or include an avatar, which is a figure or image that represents the user. Sony then combines this information with the information Sony collects and links to each user, including the games played, products owned, and actions taken while on a PlayStation device and/or

1  network;

2    c.   Utilizing third parties to collect personal information and activity from minors without

3         parental consent;

4    d.   Sharing personal information of minors with third parties, including service providers,

5         game publishers, and Sony business partners;

6    e.   Requiring users or parents to take additional steps to opt out if they do not want

7         unnecessary data collected; and

8    f.   Using the data collected on minors less than 13 years old to use a patented system of

9         analyzing gamer behavior, tracking kids with their respective PSN ID, and using a

10        deceptive marketing of in-game purchases or prepaid cards to ensure minors remained

11        engaged in the games which proximately caused the addiction and/or IGD.

12    365.   Sony has independently and in concert with third-parties, engaged in the aforementioned

13 deceptive, negligent, and intentional privacy violations and used the information garnered therefrom

14 to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on

15 and to trick minors, like Plaintiff A.G., into buying microtransactions or unknowingly make in-game

16 purchases using the game patents and other illegal dark patterns.

17    366.  Sony designed its PlayStation consoles, PlayStation Network, and other PlayStation

18 Products with addictive features, including but not limited to, engaging graphics, social aspects, and

19 rotating game libraries. and designed its PlayStation Products for use with other addictive video

20 gaming products (*e.g.*, Minecraft and Fortnite) to take advantage of the chemical reward system of

21 users' brains.

22    367.  Sony designed its PlayStation Products in conjunction with psychologists, neuroscientists,

23 and other behavioral experts to ensure that minors and young adult users continually use its video game

24 products and continually purchase addictive video game products for play on PlayStation consoles.

25    368.  Sony designed its PlayStation Products with addictive features and to be used with other

26 addictive video game products (*e.g.* Fortnite and Minecraft), while knowing that abuse, addiction, and

27 compulsive use by youth and young adults can lead to brain damage and injury, including, but not

28

limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

369. Sony failed to disclose that it designed its PlayStation consoles (including PS 4 and PS 5) with addictive features and for use with addictive video gaming products, and designed its PlayStation Network, including PlayStation Plus, with addictive features to be used with its PlayStation Products and as a product to house, purchase, and use addictive video game products, while knowing that abuse, addiction, and compulsive use by foreseeable users, *e.g.*, minors, can lead to brain damage and injury and, as such, the products pose significant risk of harm;

370. Sony designed the PlayStation consoles, PlayStation Network, PlayStation Store, and PS Plus as products to house addictive gaming products and pushed users to make purchases of addictive video game products, while knowing that abuse, addiction, and compulsive use by youth—including Plaintiff A.G.—can lead to brain damage and injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm.

371. Sony knew that its PlayStation consoles, PlayStation Network, PlayStation Store, and PS Plus products contained an inherent risk of abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals—and the harms that arise therefrom—but do not disclose such harms anywhere and instead market its products for play by such foreseeable users.

372. Sony misrepresented that its PlayStation Products were safe for use by all, including minors, young adults, and neurodivergent individuals, while knowing that these products were designed and developed with addictive features to keep users using Sony's video game products, playing video games, and purchasing addictive video game products, and while knowing that abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals can lead to brain damage and injury, such that its products pose significant risk of harm to users, like Plaintiff A.G.

373. Sony knew that its PlayStation consoles, PlayStation Network, PlayStation Store, and PlayStation Plus products, as well as the video gaming products made available for use thereon (*e.g.* Fortnite and Minecraft), contained an inherent risk of abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals, and the harms that arise therefrom, but intentionally marketed its products for use by such individuals and directed its misstatements towards users of

**DEFENDANTS'** video gaming products and other video gaming products that were designed and developed, utilizing the patents and technology described herein.

374.  Sony did not inform and concealed from the public that it designed its PlayStation Products with addictive features, or that these products could be used to purchase and download addictive games and products, despite knowing that abuse, addiction, and compulsive use by youth, young adults, and neurodivergent people can lead to brain damage and injury.

### *Switch and Switch Products: Nintendo*

375.  Nintendo is the manufacturer of the Nintendo Switch and Nintendo Switch Lite video gaming consoles (collectively, "Switch" or "Nintendo's Switch").

376.  The Switch is a hybrid gaming device that can be played on an OLED screen/tv or as a handheld console, offering users the flexibility and convenience of playing games anytime, anywhere:



14

377.  Switch allows users to play video games in hard copy, physical format, or from a digital download. Switch is also designed for online gaming and online game purchases.

378.  In order for users to enable and use Switch as intended, Nintendo designed and supplies consumers access to the Nintendo Store or "eShop," which is one of the systems used by Nintendo to market and sell video gaming products (*e.g.* Minecraft and Fortnite) for Switch users to download and play video games:

---

[14] https://www.nintendo.com/us/switch/



15

 

16

379.  Another video gaming product designed, developed, supplied, and sold by Nintendo for use with Switch is Nintendo Switch Online, which is offered to individuals and families at a base level ($19.99/year) and an "Expansion Pack" level ($49.99/year). Both options offer online play, access to hundreds of games, and a Nintendo Switch Online App that can be downloaded to a user's smartphone or tablet to access and play supported games like Fortnite and Minecraft.

380.  Upon information and belief, Nintendo utilizes the patented addictive technologies, systems, and mechanisms identified herein and other improper means to collect user's data and market their Products to consumers, including Plaintiffs. Further, once a game or other video gaming product

---

[15] https://www.nintendo.com/us/search/#q=minecraft&p=1&cat=gme&sort=df
[16] https://www.nintendo.com/us/store/products/fortnite-switch/

1    is downloaded to a user's Switch and/or downloaded to a user's Nintendo Switch Online account, the

2    user is exposed to all features of that product (including all addictive mechanisms and systems included

3    therein).

4        381.  Upon information and belief, Nintendo provides video game developers (*e.g.* Epic Games,

5    Microsoft/Mojang) a framework to initiate and process in-game purchases and microtransactions

6    through the Nintendo eShop and Nintendo Switch Online. This framework enables game developers

7    to sell microtransactions and/or loot boxes through the eShop, Nintendo Switch Online, and while the

8    consumer is playing the video game on Switch or on another device through their Nintendo Switch

9    Online account. In exchange, Nintendo keeps a percentage of all revenue generated by these

10    microtransactions and in-app purchases.

11        382.  Nintendo specifically designed Switch, eShop, and Nintendo Switch Online to attract

12    users to use video game products and purchase in-game products therein—regardless of the content

13    such games may include.

14        383.  Upon information and belief, Nintendo hires behavioral psychologists and neuroscientists

15    to design its Switch consoles, the Nintendo eShop, Nintendo Switch Online, and its video games, as

16    well as Nintendo's marketing efforts so as to attract potential users, especially minors, young adults,

17    and neurodivergent individuals.

18        384.  Nintendo is aware that several of the video games available to be used via Switch,

19    including those downloadable from the Nintendo eShop or playable via Nintendo Switch Online, are

20    designed to continuously encourage users to purchase in-game products and to be addictive, and

21    thereby pose unreasonable risk of harm to users, particularly minors and neurodivergent individuals.

22        385.  Nintendo does not adequately inform users of the inherent risks involved with using its

23    video gaming products, nor with using the games being used thereon, that were designed to addict and

24    harm users.

25        386.  Nintendo markets its own video game products and video game products manufactured,

26    designed, and developed by third-parties, including the sale of virtual currencies and product upgrades

27    for those products; to wit, Nintendo markets and sells Switch/Fortnite and Switch/Minecraft "bundle"

28

1   products and Minecoins are marketed and sold in both digital and physical gift card forms to be used

2   on and with Nintendo Products.

3       387.  Nintendo markets Switch to children and families as a system that allows users to "Play

4   anytime, anywhere" and to "Play at home or on the go" while knowing such use, and particularly that

5   prolonged exposure to Nintendo's video gaming products and other Defendants' video gaming

6   products, is more likely than not to cause harm and addictive behavior in users due to the design of

7   those products—and without warning any consumer of the dangers and risks associated with such use.

8       388.  Nintendo designed the Switch, Nintendo eShop, and Nintendo Switch Online with

9   addictive features, mechanisms, and systems to take advantage of the chemical reward system in users'

10  brains.

11      389.  Nintendo designed the Switch, Nintendo eShop, and Nintendo Switch Online in

12  conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users

13  continually purchase addictive products for play on the Switch.

14      390.  Nintendo designed the Switch with addictive features and with the intent that users use

15  the Switch console to play addictive video games, and designed the Nintendo eShop and Nintendo

16  Switch Online to sell, supply, store, and play addictive gaming products and, using patented

17  technologies and other operant conditioning mechanisms, pushed users to purchase video gaming

18  products for use and play on the Switch, while knowing that extended play, abuse, and compulsive use

19  by minors and neurodivergent people can lead to addiction, brain damage, and injury, including, but

20  not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on

21  cognitive processes, and other harmful effects.

22      391.  Nintendo failed to disclose that it designed Switch, Nintendo eShop, and Nintendo Switch

23  Online with addictive features and that Nintendo's video gaming products are designed to be used with

24  and to entice users to purchase addictive products, despite knowing that abuse, addiction, and

25  compulsive use by foreseeable users, *i.e.*, minors and neurodivergent people, can lead to injury and, as

26  such, the products pose significant risk of harm.

27      392.  Nintendo knew that Switch, Nintendo eShop, and Nintendo Switch Online, along with the

28  products made available thereon, contained an inherent risk of abuse, addiction, and compulsive use

by youth and the harms that arise therefrom from playing video games available on the Switch, Nintendo eShop, and Nintendo Switch Online as described herein, but instead of disclosing such harms, Nintendo marketed its products as safe for use and extended play by all, including minors.

393.   Nintendo misrepresented that its Switch, Nintendo eShop, and Nintendo Switch Online were safe for use by minors, while knowing that they was designed and developed with addictive features to keep users purchasing addictive products, and while knowing that abuse, addiction, and compulsive use by youth can lead to injury, such that its products pose significant risk of harm to users, like Plaintiff A.G.

394.   Nintendo knew that its Switch, Nintendo eShop, Switch Online and Nintendo Mineraft and Fortnite contained an inherent risk of abuse, addiction, and compulsive use by youth and neurodivergent individuals, and the harms that arise therefrom, but intentionally marketed its products for use by the general public, including minors, and directed its misstatements towards users of these gaming products and other games that were designed and developed, utilizing the patents and technology described herein.

395.   Nintendo, in connection with the Switch, Nintendo eShop, and Nintendo Switch Online, engaged and/or engages in the following conduct:

    a.   Failing to notify parents that children had open access to in-game purchases;

    b.   Collecting personal data from children, including account information, content interaction, purchase information, location information, and health information, despite being aware that numerous children were playing games through Switch;

    c.   Requiring parents who requested that their children's personal information be deleted to complete a number of steps to make such request;

    d.   Requiring users or parents to take additional steps to opt out if they do not want unnecessary data collected;

    e.   Sharing personal information of children with third parties, including service providers, game publishers, and Nintendo business partners, and failing to regulate how those third parties utilize the personal information;

    f.   Utilizing third parties to collect personal information and activity from minors without

1       parental consent;

2      g.  Using dark patterns to entice minors, including Plaintiff A.G., into microtransactions

3         without parental consent or consent of the account holder, including, but not limited to,

4         attracting and enticing minors into microtransactions based on the minor-player's gaming

5         behavior and their personal data (*e.g.*, IP addresses, geolocation, voice) that is illegally

6         collected, not deleted, or gained through passive tracking applications; and

7      h.  Collecting and retaining children's voice and audio information.

8      396.  Nintendo has independently and in concert with third-parties, engaged in the

9 aforementioned deceptive, negligent, and intentional privacy violations and used the information

10 garnered therefrom to analyze the gaming and purchasing behavior of minors and design game releases

11 tailored to prey on and to trick minors, like Plaintiff A.G., into buying microtransactions or

12 unknowingly make in-game purchases using the game patents and other illegal dark patterns.

13      397.  Nintendo did not inform and concealed from the public that it designed the Switch and

14 Nintendo eShop with addictive features, or that these products could be used to download addictive

15 games and products, despite knowing that abuse, addiction, and compulsive use by minors and

16 neurodivergent individuals can lead to brain damage and injury

17 ***Products that Incorporate Addictive Design Features Effect the User's Brain***

18      398.  Research has shown that prolonged use of Products damages the prefrontal cortex of the

19 user, causing a loss of grey matter, lower cognitive function, and an inability to regulate impulse

20 control. Research has concluded that such use of Products may lead to negative effects like stress,

21 aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping

22 disorders, anxiety, and behavioral addiction disorders. Clinical evidence has shown that users addicted

23 to online games experience biopsychological symptoms and complications, including symptoms

24 traditionally associated with substance abuse and addiction, such as hangovers, changes in mood,

25 adaptability, withdrawal, conflict, and recurrence symptoms.

26      399.  Empirical studies indicate that gaming disorder is associated with detrimental health-

27 related outcomes.

28  ///

400.   Brain imaging studies have shown that use of video gaming products negatively affects the brain regions responsible for reward, impulse control, and sensory-motor coordination.

401.   Other studies have shown that disordered and/or excessive use of video gaming products leads to negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making.

402.   The prefrontal cortex—the locus of judgment, decision-making, and impulse control—is still developing and undergoing major reorganization during adolescence. This region of the brain does not reach maximum capacity until the age of 25 or 30. The executive control center of the prefrontal cortex is essential to one's ability to healthfully weigh risks and rewards and for pausing the pursuit of immediate rewards in favor of more adaptive longer-term goals, which is arguably the explanation why young people are more likely to engage in hours of use while ignoring basic needs like food, sleep, and hygiene. Without mature frontal lobes to draw upon, minors as well as young adults are less able to weigh potential negative consequences and curb potentially harmful behavior like excessive use of video games, which furthers impact frontal lobe development.

403.   Brain imaging studies have shown structural changes in the brain, particularly a reduction in white-matter density (consisting mostly of cells and axons that transmit signals from the cerebellum to other brain regions) and grey-matter volume (associated with emotions, perception, memory, and motor control). Specifically, studies[17] show several regions of the brain showed reduction in grey-matter volume in gaming disorder participants:



_____

[17] Aviv Weinstein et al., *Neurobiological mechanisms underlying internet gaming disorder*, 22(2) DIALOGUES CLIN. NEUROSCI. (2020).

404. Brain activation studies have shown that the use of video games causes changes in the reward and impulse control regions of the brain, and that gaming pictures or images activate regions of the brain in a way that is similar to the way the brain is activated in response to cue-exposure to drugs (whereby addicts are exposed to relevant drug cues to extinguish conditioned responses).

405. Additional brain activation studies have shown that individuals with gaming disorders have impaired inhibitions, and that video game cues activate craving, attention, and executive function areas of the brain. Those cognitive, sensory-motor, and emotional processes may be associated with long-term changes to the brain as a result of prolonged of video gaming products. Regions that showed activation in response to video game cues in gaming disorder participants in more than two studies[18] are:



406. Brain structural studies have shown alterations in the volume of the ventral striatum (a critical component of motor and reward systems in the brain) are possible as a result of changes in reward regions of the brain. One comparison study of young adults with a mean age of 24 revealed that individuals who engage in excessive use of video games tend to have lower cognitive function, particularly in areas of verbal ability and working memory.

407. Research has shown that a neurodivergent minor with a diagnosis of ADHD or Autism Spectrum Disorder is at a higher risk of developing video game disorder or addiction which can worsen one's ability to control impulsivity and result in brain damage. Research has shown that while use of video games may foster creativity in some minors, such potential benefits are outweighed by the risk of developing addiction or disordered use of video gaming products which typically develops swiftly

---

[18] *Id.*

1   in minors and neurodivergent individuals. This is particularly true when the Products incorporate

2   microtransactions and other manipulative tactics.

3       408. The **DEFENDANTS'** Products were designed to and do cause an intense dopamine

4   release in the user that is similar in magnitude to that experienced by drug use or gambling. Dopamine

5   is a neurotransmitter made in the brain that acts as a chemical messenger that communicates messages

6   between one's nerve cells in the brain, as well as between one's brain and the rest of the body.

7   Dopamine serves as the brain's all-important "reward center" and, in addition, plays a critical role in

8   several body functions including attention, mood, pleasurable reward and motivation, sleep, learning,

9   and movement. The release of dopamine causes demonstrable physical, mental, and emotional

10   responses in the human brain and body. This is especially true in minors and particularly true in

11   neurodivergent minors, whose brains are still developing. The increased dopamine releases can lead to

12   withdrawal symptoms, including anger, irritability, or physical outbursts when the game is made

13   unavailable.

14       409. The repetitive release of dopamine that was designed to and does occur in minors who are

15   users of the **DEFENDANTS'** Products, when used as intended, create, reinforce, and strengthen a

16   dysregulated or dopaminergic neural pathway that propels the user to hyperfocus on using the products

17   more and more, first at an increasing rate and then with compulsive desire until the impulse to use the

18   products develops into a disordered use or addiction. Those dysregulated neural pathways trigger

19   addictive, compulsive, and impulsive behaviors outside of the gaming world consisting of life-altering

20   impulsivity and inhibitory control behaviors that can and do cause a myriad of catastrophic physical,

21   mental, and emotional disorders, symptoms, and injuries, including other addictions, significant

22   withdrawal symptoms, maldevelopment of the brain's frontal lobe, dissociative behaviors, social

23   isolation, damage and/or negative consequences to cognitive processes, attention disorders, severe

24   depression, morbid obesity, and other harmful effects, all to the severe detriment and damage to the

25   minor child, and to the severe emotional detriment and pecuniary or economic damage to their families

26   and caretakers, specifically including the Plaintiffs herein.

27   ///

28   ///

## PLAINTIFFS' CLAIMS

410.   Plaintiffs reallege and incorporate by reference all of the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

411.   The **DEFENDANTS** are estopped from relying on any statute of limitations as a defense in this action. The filing of this Complaint falls within the statute of limitations pursuant to applicable statutory law and via operation and application of the discovery rule and the tolling of the minor Plaintiff's right to causes of action. Moreover, the filing of this Complaint falls within the statute of limitations in light of the continuing nature of the alleged tortious conduct and the alleged participation by the **DEFENDANTS** in placing their defective video gaming product into the stream of commerce, an activity and course of conduct which is ongoing and, in addition, in light of the fraud-based claims embraced and adopted by the Restatement of Torts.

412.   Plaintiffs bring this personal injury action pursuant to and within the statute of limitations set forth in California Code of Civil Procedure § 335.1 in light of the application of California's "discovery rule" permitting the postponement of the accrual date of these causes of action until the Plaintiff discovers or has reason to discover the causes of action and, further, in light of the tolling of the applicable statute of limitations due to the minor Plaintiff's age pursuant to California Code of Civil Procedure § 352 and California Family Code § 6500.

413.   Through the exercise of reasonable diligence, Plaintiffs could not have discovered, nor did they have any reason to be suspicious, that the **DEFENDANTS'** Products and conduct as alleged herein, caused or could cause the injuries and damages Plaintiffs sustained, because at the time those injuries revealed themselves, their cause was unknown to Plaintiffs and Plaintiffs did not suspect and had no reason to suspect that the **DEFENDANTS'** products and/or conduct caused their injuries until within the last year.

414.   Plaintiffs' lack of suspicion was compounded, and their failure to discover the cause of the injuries earlier was furthered, by the fact that the **DEFENDANTS** had exclusive knowledge of the defects of the Products and resolved to not disclose those defects and dangers of their products to consumers and/or users of the products, including to minors and/or their parents.

///

415.  Plaintiffs' lack of suspicion was further compounded by the **DEFENDANTS'** deceitful conduct and their resolve to make false and reckless misrepresentations to the public whereby the **DEFENDANTS** not only failed to disclose the risks posed by the products for which they had a duty to disclose, but, and in addition, falsely conveyed to the public that the products posed no risks of danger to users and were safe to use for their intended purpose and as reasonably foreseeable.

416.  The **DEFENDANTS'** negligent, deceitful, and otherwise wrongful tortious conduct as herein alleged, along with their participation in placing into the stream of commerce defective and unreasonably dangerous Products, is continuous in nature such that, to date, that wrongful participation is continuing which means that so is Plaintiffs' right of action against the **DEFENDANTS**. Accordingly, the statute of limitations to bring the causes of action alleged herein, for this additional reason, has not yet accrued and will not begin to accrue until the **DEFENDANTS'** tortious conduct and wrongful participation in placing their defective and unreasonable dangerous video gaming products into the stream of commerce ceases.

### First Cause of Action: Strict Product Liability

### (Defective Design and Defective Failure to Warn)

417.  Plaintiffs reallege and incorporate by reference all of the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

418.  The **DEFENDANTS**, at all relevant times, have marketed and advertised the video gaming products at issue herein throughout the United States, including in California, for personal use by end-users/consumers of all ages, including minors, and specifically Plaintiff herein.

419.  The **DEFENDANTS** are, individually and/or in concert with one another, designers, manufacturers, marketers, sellers, developers, licensors, licensees, patent holders, and otherwise participants in placing into the stream of commerce the defective video gaming products, whether in design or in failing to warn about, and each is strictly liable to Plaintiffs herein for the harm and injuries and damages said products caused.

420.  The Products the **DEFENDANTS** placed into the stream of commerce were defectively designed; to wit, designed to cause addictive and compulsive use of the products, including by minors, and without any warning of that danger, and which did in fact and proximately cause addictive,

disordered use by Plaintiff A.G. and their parent and Co-Plaintiff and injuries and damages as a result. Both defects, in design and in warning, were present in the video gaming products when the products left the hands of the **DEFENDANTS** and, as such, were unreasonably dangerous at the time they were released to the general consuming public to be used in their intended and foreseeable manner. The **DEFENDANTS'** Products did cause users to develop a disordered, compulsive, and addictive use of those products, including Plaintiff A.G., to their detriment and harm and to the harm and detriment of their caregivers, here A.G.'s parent and Co-Plaintiff herein.

421.    The **DEFENDANTS'** products did not perform as safely as an ordinary consumer would have expected, are more dangerous than other Products because they were intentionally designed to be addictive to those using them, and specifically to minors users, which causes a myriad of potential injuries and harm and damages, and which here did result from Plaintiff A.G.'s use of their Products.

422.    The **DEFENDANTS'** Products were unreasonably dangerous and defective because they incorporated addictive design features intended to cause addictive, compulsive, and disordered use of the products that are not necessary to the intended utility of the products and instead pose a risk of danger to users, risks that are and were known to the **DEFENDANTS** but not known or reasonably anticipated by the users, including Plaintiffs herein.

423.    Said defective design of the Products was and continues to date to be suppressed and concealed by the **DEFENDANTS** with the purpose and intention of taking advantage of the chemical reward system of the user's brain (especially a minor's brain) to create addictive engagement and compulsive use of the video gaming products, without regard for consequential mental and physical harm. Said series of intentions and conduct of the **DEFENDANTS** resulted in harm and damages to the Plaintiffs as alleged herein.

424.    The **DEFENDANTS'** defective and unreasonably dangerous Products posed risks to users of the products, particularly to minors, when used in their intended and foreseeable manner, and despite the fact that the **DEFENDANTS** knew or by the exercise of reasonable care, should have known, that said products were defective and unreasonably dangerous to the minors who used them who were at risk of suffering severe injuries as a result of their use. The defects of the Products were incorporated in said products at the time they left the **DEFENDANTS'** possession.

425.  The **DEFENDANTS'** Products are defective and unreasonably dangerous because they included no warning, an inadequate warning, no instruction, or an inadequate instruction, of the herein identified risks and dangers the products pose to users, and specifically to minors, as a result of foreseeable and intended use of the products, despite the fact that the **DEFENDANTS** knew or by the exercise of reasonable care should have known that said products were defective and that users, including minors, were likely to suffer severe injuries as a result. The Products here at issue contained no warning when the products left the **DEFENDANTS'** possession.

426.  The defects in the design and warning of each of the **DEFENDANTS'** Products, as herein alleged, all existed prior to their release to the public, and there was no substantial change to any of the products between the time of their distribution into the stream of commerce, including the absence of an adequate warning, and when they reached the hands of the consumer public, specifically including Plaintiffs herein.

427.  Plaintiff A.G. used the **DEFENDANTS'** Products as intended and as reasonably foreseeable, and each **DEFENDANT** knew or, by the exercise of reasonable care, should have known that minors, inherently including Plaintiff A.G., would use the video gaming products without anyone inspecting the products for addictive or other dangerous features.

428.  Reasonable users of **DEFENDANTS'** Products would not expect, and Plaintiffs herein did not expect, that said Products would pose risks of severe physical and mental harm much less that the **DEFENDANTS** knew of those risks and nevertheless chose to place their products into the stream of commerce and in doing so placed financial profit over the health and safety of the consumers, including minors.

429.  The **DEFENDANTS'** participation in placing the defective Products into the stream of commerce, and into the hands of Plaintiffs specifically, was a substantial factor in causing Plaintiffs' injuries and harms, both the actual and proximate cause of those injuries, and Plaintiffs are entitled to recover compensatory damages in an amount according to proof and subject to each Plaintiffs' standing and applicable statute(s).

430.  In addition to failing to perform as safely as an ordinary consumer would expect, the **DEFENDANTS'** Products pose risks to users, specifically minor users, when the products are used as

reasonably foreseeable and as intended. The benefits of the defective design of the **DEFENDANTS'** Products, as financially profitable as they may be, are outweighed by the horrific physical and mental injuries and harm the development of addicted or disordered use causes, particularly in minor.

431.    The gravity of the potential harm arising from the defective Products, as herein identified and alleged, is severe. The likelihood that said harm, as alleged, will occur is high.

432.    An alternative safer design of the **DEFENDANTS'** Products, at the time of their design, development, and distribution, was and is entirely feasible. Each of the **DEFENDANTS** could have utilized cost-effective, reasonably feasible alternative designs including those that omit or minimize addictive features incorporated into the products to minimize the harms and risk of dangers addictive features pose to users, including, but not limited to: choosing to not use and incorporate into the products the patented technologies containing "addictive" design features as herein described and alleged; redesigning gaming software to limit rather than promote addictive engagement; implementing robust age verification, effective parental controls and notifications; warning of health effects of use and extended use upon sign-up or log-in; implementing default protective limits to the length and frequency of gaming sessions, opt-in restrictions to the length and frequency of gaming sessions, self-limiting tools, including, but not limited to, gameplay time notifications, warnings, or reports; implementing blocks to use during certain times of day (such as during school hours or late at night), limits on number of usable games per day; limits on the strategic timing and clustering of offers and/or assignments and challenges to keep users engaged and using longer; implementing limits on minors' in-game purchases, downloadable content, microtransactions, and total in-game spending per day; and designing products that did not include other defective features listed in this Complaint while allowing users to engage with the products so that the engagement is addictive free.

433.    The cost of an alternative design is de minimis at best, being hypothetically costly only to the **DEFENDANTS'** financial bottom line that the **DEFENDANTS** have always placed above the health and safety of users, including minors. There are no meaningful disadvantages to said alternative design. The safety and well-being of users of the products, especially those who are minors, who risk brain damage and life-long addictive and disordered behaviors and a myriad of other potential life-altering physical, mental, and emotional disorders as previously identified herein that are caused by

using the products, render the application of the risk-benefit test here articulated forever in the favor of the consumer public and Plaintiffs specifically.

434. The dangers of putting into the stream of commerce the **DEFENDANTS'** Products intentionally designed to cause addictive use, including by minors, that could potentially cause the laundry list of potential injuries arising from such addictive and disordered use of the products, far outweigh the benefit of the addictive design features incorporated into the products themselves.

435. The **DEFENDANTS** knew or should have known that their Products posed a risk of causing severe injuries to users, particularly minor users, at the time the products were designed, developed, manufactured, distributed, and sold. Ordinary consumers would not have, and could not have, recognized those potential risks.

436. The herein alleged conduct of the **DEFENDANTS** was and is willful, malicious, fraudulent, outrageous, and in conscious disregard and indifference to the safety and health of minors, including Plaintiff A.G. herein, and those similarly situated. Plaintiffs, for the sake of example and by way of punishing said defendants, seek punitive damages according to proof.

437. WHEREFORE, Plaintiffs pray judgment against the **DEFENDANTS**, and each of them, as hereafter set forth.

<u>**Second Cause of Action: Negligence**</u>

**(Negligent Design and Negligent Failure to Warn)**

438. Plaintiffs reallege and incorporate by reference all of the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

439. The **DEFENDANTS**, as business owners, owed to Plaintiffs a duty to act as a reasonably careful company would under the circumstances.

440. The **DEFENDANTS** owed Plaintiffs and the consumer public a duty of due care to place into the stream of commerce their Products in a manner and condition that Plaintiff A.G. could use them in a safe and non-dangerous manner.

441. The **DEFENDANTS**, in their capacities as designers, developers, assemblers, manufacturers, packagers, labelers, suppliers, marketers, sellers, and in patenting, licensing and otherwise distributing and placing into the stream of commerce, their Products for personal use

throughout the United States, including consumers in California, and specifically to minors and their caregivers in California, and specifically to Plaintiffs herein, the **DEFENDANTS** owed a duty to exercise ordinary care in so doing regardless of the specific participatory activity each engaged in, including a duty to warn consumers of the foreseeable risks and dangers of the products that the **DEFENDANTS** knew were present but not obvious or known or knowable to users, especially underage users, or their caregivers, or any average member of the consuming public.

442.    The **DEFENDANTS**, in addition, owed a heightened duty of care to minors who use the products at issue, specifically including Plaintiff A.G., because minors' brains are not fully developed which results in their diminished capacity to make healthful positive decisions regarding use of the Products, eschew self-destructive behaviors, and overcome the compulsion and desire to use the products more and more despite experiencing negative and destructive short-term and long-term consequences from that use, whether physical, mental, or emotional, and despite restrictions and instructions from adults to not use the Products.

443.    The **DEFENDANTS** knew or should have known, were aware or should have been aware, of the catastrophic risks and dangers their Products posed to users thereof when used in a reasonably foreseeable manner. The **DEFENDANTS** knew of the dangers and risks posed by their Products because the Products were intentionally designed with addictive features to cause compulsive use of the products. The **DEFENDANTS** knew of the severe dangers use of their Products posed to minors who used them, but nevertheless continued to place said Products into the stream of commerce, including into the hands of Plaintiffs herein, without the general consumer public nor Plaintiffs individually having any knowledge, suspicion, or any reason to know or suspect, of the defects and unreasonable dangers posed to the users of said products.

444.    The **DEFENDANTS** invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of Plaintiff A.G.'s use of the Products.

445.    The **DEFENDANTS**, and each of them, breached the duty they owed to Plaintiff A.G., a foreseeable user of their Products, by failing to meet the standard of care: the **DEFENDANTS** failed to exercise reasonable care in their own activities and thereby created a risk of harm to Plaintiffs that could have been and in fact was reasonably anticipated and did in fact cause then injuries.

446.  Upon information and belief, the **DEFENDANTS**, and each of them, breached their duties to Plaintiffs by failing to exercise ordinary care and due diligence in negligently placing into the stream of commerce the video gaming products used by Plaintiff A.G. in that the products could not be operated in a safe and non-dangerous manner and instead posed risks of severe injuries and harm and were unreasonably dangerous as designed.

447.  A reasonably prudent or careful company would protect Plaintiff A.G. from unreasonable risk of injury from their use of their Products, yet each of the **DEFENDANTS** did not do that.

448.  A reasonably careful entity would not create an unreasonable risk of harm from the use of its Products (including an unreasonable risk that use could result in the development of an addiction or compulsive disordered use of the Products that could cause brain damage, suicidal ideation, sleep deprivation, anxiety, depression, or other physical, mental, and emotional injuries), yet each of the **DEFENDANTS** did just that.

449.  The **DEFENDANTS** are and were negligent and careless in that they failed to exercise ordinary care and caution for the safety of users of their Products, particularly underage users like Plaintiff A.G.

450.  Upon information and belief, the **DEFENDANTS'** activities and omissions as alleged herein contributed in natural and/or continuous sequence to serve as a substantial factor in causing the Plaintiffs' injuries. At all times mentioned herein, the **DEFENDANTS**, through their negligence as alleged herein, ignored their responsibilities to Plaintiffs and unreasonably jeopardized the health and well-being of Plaintiffs and caused Plaintiffs' injuries as alleged. Further, in light of the potential and actual risk of catastrophic harm associated with using the Products at issue, especially minor users, and particularly with respect to neurodivergent minors, a reasonable person or entity which had actual knowledge of the potential and actual risk of harm would have concluded that the video gaming products should not have been marketed, sold, or distributed in the condition they were, *i.e.*, designed with intentionally addictive qualities, and without a warning of the risks of dangers they posed.

451.  Upon information and belief, the video gaming products the **DEFENDANTS** placed into the stream of commerce are defective because they are designed to be addictive to users, particularly minors who are users, and which causes users and their caregivers to suffer life-altering physical,

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

mental, and emotional injuries arising from the addictive and disordered use, including brain damage, attention disorders, severe depression, morbid obesity, and other injuries extremely dangerous to the health and welfare of children. Plaintiff A.G. is amongst that group of injured minors in that they suffer from diagnosed anxiety as well as the other injuries herein identified proximately caused from using the products that were designed, without warning, to be addictive.

452.    Upon information and belief, the **DEFENDANTS** negligently failed to include a warning, an inadequate warning, an instruction, or an inadequate instruction, of and/or regarding the herein identified risks and dangers of using the Products here at issue, including risks posed to minors who use the products, in their intended and foreseeable manner, and despite the fact that the **DEFENDANTS** knew or by the exercise of reasonable care, should have known, that said products were intrinsically defective and inherently and unreasonably dangerous and that minors who used them were likely to suffer severe injuries.

453.    Upon information and belief, the **DEFENDANTS'** Products were and are defective due to the **DEFENDANTS'** negligence in testing those products.

454.    The **DEFENDANTS** are and were negligent in failing to allow independent academic researchers to adequately study the effects of the video gaming products and levels of overplay and overuse by minors. The **DEFENDANTS** are alternatively and/or additionally negligent in that they ignored studies performed by independent academic researchers demonstrating that use and overuse of the products at issue resulted in severe and several negative physical, mental, and emotional injuries to minors.

455.    The **DEFENDANTS** knew that their Products are and were harmful, capable of causing and in fact were designed to cause compulsive, addictive use, particularly in minors, and that such use could result in severe physical, mental, and emotional injuries and, further, knew that caregivers of such minors were ignorant of and had no reason to know of and which they would in any event be helpless to effectively or meaningfully monitor and/or prevent.

456.    Due to the **DEFENDANTS'** negligence as herein alleged, the Products used by Plaintiff A.G. were defective and unreasonably dangerous when put into the stream of commerce by the **DEFENDANTS**, and **DEFENDANTS** are liable for the injuries arising from their negligence in

placing said defective Products into the stream of commerce without adequate warning or instruction regarding the dangers those Products posed to users, specifically to minors.

457. The **DEFENDANTS** are and were negligent in failing to fully assess, investigate, and restrict the use of their Products, all to Plaintiffs' detriment as alleged herein.

458. The **DEFENDANTS** are and were negligent in failing to provide users who are minors, and their caregivers, the tools to ensure said products are used in a limited and safe manner by underage users, all to Plaintiffs' detriment as alleged herein.

459. A reasonably careful company would not invite, encourage, or facilitate children, such as Plaintiff A.G., to engage in dangerous behavior through, or as a reasonably foreseeable result of, using its Products; yet each of the **DEFENDANTS** did just that by inviting, encouraging, and facilitating young children to use their Products.

460. The **DEFENDANTS** are and were negligent in failing to provide adequate warnings about the dangers associated with the use of their Products and in failing to advise users and their caregivers about how and when to use those products, or any other parameters to follow, in order to ensure safer use of the same.

461. The **DEFENDANTS** breached their duties to provide timely and adequate warnings, instructions, and information, at least in the following particulars:

a.    Negligently failing to ensure the Products included warnings regarding their addictive design that were accurate, conspicuous, and adequate, despite having extensive knowledge of the risks associated with their use;

b.    Negligently failing to conduct adequate pre-and-post-market safety testing such that an adequate warning could have been issued to users;

c.    Negligently failing to include adequate and conspicuous warnings that would alert users to the dangerous risks of the Products, including, but not limited to, among other things, the risks of causing severe and life-altering physical, mental, and emotional disorders and behaviors in minors, especially those with neurodivergent qualities, including, but not limited to, disordered and addictive behaviors such as withdrawal symptoms, brain damage, dissociative

behavior, social isolation, damage or negative consequences to and/or cognitive processes, attention disorders, severe depression, morbid obesity, and other harmful effects; and

    d.    Negligently representing that the Products were and are safe for use, when in fact, the **DEFENDANTS** knew or should have known that said products were designed to cause minors to overplay them until they developed an addiction or disordered compulsion to use the products, and as such are and were actually unreasonably dangerous for use when operated as was foreseeable and intended by the **DEFENDANTS**.

    462.  Moreover, the **DEFENDANTS** breached their duty of care owed to Plaintiffs through their non-feasance, failure to act, and omissions in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

    a.    Utilizing information obtained in violation of state and federal laws to design the video gaming products to be more addictive and to target specific individuals based on information obtained and retained by **DEFENDANTS** and/or third-parties;

    b.    Failing to implement effective protocols to block users under the age of 13;

    c.    Failing to implement effective parental controls;

    d.    Failing to implement reasonably available means to monitor for and limit or deter excessive frequency or duration of use of products by youth, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

    e.    Failing to implement reasonably available means to monitor for and limit or deter excessive overplaying and overspending by youth on in-game downloadable products and upgrades and in-game purchases and/or microtransactions;

    f.    Failing to implement reasonably available means to limit or deter use of products by youth during ordinary times for school or sleep; and

    g.    Failing to implement reasonably available means to set up and operate its products without features and patented addictive technology, as discussed above, that rely on unreasonably dangerous methods as a means to engage users who are minors.

///

463. A reasonable company under the same or similar circumstances as each of the **DEFENDANTS** would have developed, set up, managed, maintained, supervised, and operated its products in a manner that is safe or at the very least more safe and protective of users and especially children who use their products, including children like Plaintiff A.G., yet none of the **DEFENDANTS** did this and thereby breached the duty they owed to Plaintiffs herein. As a result of the **DEFENDANTS'** negligence, A.G. suffered and continues to suffer physical and mental injuries, including anxiety, irritability, depression, DSM-5 diagnostic symptoms present, sleep deprivation, loss of friends at school, and gamer's rage/aggression upon withdrawal. As a result of the **DEFENDANTS'** negligence, Plaintiff MELISSA BLACK suffered and continues to suffer emotional distress and pecuniary hardship and damages due to their child A.G.'s injuries as herein alleged from using the **DEFENDANTS'** Products as alleged herein.

464. The **DEFENDANTS'** negligence, via the herein described and alleged breach of the duty of care each owed to Plaintiffs herein, was a substantial factor in causing the harm, injuries, and damages Plaintiffs have sustained from Plaintiff A.G.'s use of their products. Each of the **DEFENDANTS'** breach of one or more of its duties was a proximate cause of A.G.'s injuries and the damages sustained by Plaintiffs in that each of the **DEFENDANTS'** products incorporated addictive design features that caused and contributed to harm and damages to users of the products who were young children, including A.G.

465. The herein alleged conduct of the **DEFENDANTS** was and is willful, malicious, fraudulent, outrageous, and in conscious disregard and indifference to the safety and health of minors, including Plaintiff A.G. and those similarly situated. Plaintiffs, for the sake of example and by way of punishing the **DEFENDANTS**, seek punitive damages according to proof.

466. WHEREFORE, Plaintiffs pray judgment against the **DEFENDANTS**, and each of them, as hereafter set forth.

### Third Cause of Action: Negligence

### (Common Law Negligence)

467. Plaintiffs reallege and incorporate by reference all of the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

468.  At all times material hereto, the **DEFENDANTS** had a duty to exercise reasonable care and caution for the safety of individuals using their products, including Plaintiff A.G.

469.  At all times material hereto, the **DEFENDANTS** owe a heightened duty of care to minors who are users of their Products because the brains of children and adolescents are not fully developed which results in a diminished capacity to make mindful, healthful decisions regarding their use of the products here at issue.

470.  As product designers, developers, manufacturers, marketers, sellers, and otherwise engaging in activity culminating in placing their Products into the stream of commerce, and into the hands of the Plaintiffs herein, the **DEFENDANTS** owed a duty to exercise ordinary care in placing the Products into the stream of commerce, including a duty to warn users of the hazards of using their Products, hazards the **DEFENDANTS** knew to be present in their products that were not obvious to users, and particularly not obvious to minor users.

471.  As business owners, **DEFENDANTS** owed the users of their Products, including Plaintiffs herein, from whom they collectively derive billions of dollars per year in microtransactions and initial purchases, a duty of ordinary care to act as a reasonably careful company would under the circumstances.

472.  As "persons" under the law, the **DEFENDANTS** owed a duty to all consumers to exercise ordinary care and act as a reasonably careful company would under the circumstances, including following state and federal law.

473.  The **DEFENDANTS**, in their capacities as designers, developers, assemblers, manufacturers, packagers, labelers, suppliers, marketers, sellers, and in patenting, licensing, and otherwise distributing and placing into the stream of commerce the video gaming products to consumers for personal use throughout the United States, including consumers in California, and specifically to minor consumers and their caregivers in California, and specifically to Plaintiffs herein, owed a duty to exercise ordinary care to effectuate placing the products into the stream of commerce, including a duty to warn of the foreseeable risks of using the **DEFENDANTS'** Products that the **DEFENDANTS** knew were present but which were not obvious or known or knowable to underage

1  users and in the case of minor users, their caregivers, so that the products could be used in a safe and

2  non-dangerous manner.

3      474.  The **DEFENDANTS** were negligent, grossly negligent, reckless, and/or careless in that

4  they failed to exercise ordinary care and caution for the safety of the users of their Products, and

5  particularly underage users such as Plaintiff A.G.

6      475.  The **DEFENDANTS** were negligent in failing to conduct adequate testing and failing to

7  allow independent academic researchers to study the effects of their products and levels of problematic

8  use amongst users who were of minor age. The **DEFENDANTS** knew and know that their Products

9  are harmful, capable of causing extensive physical, mental, emotional, and financial or economic harm

10  and damage, and that minor users are developing disordered and addicted use that their caregivers are

11  helpless to meaningfully or effectively monitor and prevent.

12      476.  The **DEFENDANTS** were and are negligent in failing to provide adequate warnings about

13  the dangers associated with using their products and in failing to warn users, and the parents of users

14  who are minors, including Plaintiff A.G., about how and when, if ever, to safely use their products.

15      477.  The **DEFENDANTS** were and are negligent in failing to provide users, and their

16  caregivers in the case of users who are minors, including Plaintiff A.G., the tools to ensure that their

17  Products are used in a limited and safe manner.

18      478.  As a result of the **DEFENDANTS'** breach of the herein identified duties and resulting

19  negligence, Plaintiffs suffered severe physical and mental harm and economic damages from Plaintiff

20  A.G.'s use of their products.

21      479.  The **DEFENDANTS'** conduct in breaching their duty to care to Plaintiffs as herein

22  alleged was a substantial factor in causing harm to the Plaintiffs and is both the actual and proximate

23  cause of said harm.

24      480.  As a direct and proximate result of the **DEFENDANTS'** breach of one or more of the

25  herein identified duties of care owed to Plaintiffs, Plaintiffs were injured, harmed, and damaged as

26  herein alleged.

27      481.  The herein alleged conduct of the **DEFENDANTS** was and is willful, malicious,

28  fraudulent, outrageous and in conscious disregard and indifference to the safety and health of minors,

1  including Plaintiff A.G. herein, and those similarly situated. Plaintiffs, for the sake of example and by

2  way of punishing said defendants, seek punitive damages according to proof.

3      482.   WHEREFORE, Plaintiffs pray judgment against the **DEFENDANTS**, and each of them,

4  as hereafter set forth.

**Fourth Cause of Action: False Representation**

**(Restatement of Torts, Section 402-B)**

7      483.   Plaintiffs reallege and incorporate by reference all of the foregoing allegations of every

8  paragraph of this Complaint as if repeated in full here.

9      484.   At the aforementioned time when the **DEFENDANTS**, and each of them, researched,

10  designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared,

11  distributed, marketed, supplied, sold, tested or failed to test, inadequately warned or failed to warn,

12  failed to provide adequate use instructions for minimizing the risks inherent in the use of their defective

13  and unreasonably dangerous video gaming products, and otherwise placed into the stream of commerce

14  those Products, the **DEFENDANTS**, and each of them, expressly and impliedly represented to

15  members of the general public, including the purchasers and users of said product, specifically

16  including the Plaintiffs herein, that the Products were of merchantable quality, and safe for the use for

17  which was foreseeable and intended.

18      485.   The purchasers and users of the Products, including Plaintiffs herein, and specifically

19  Plaintiff A.G.'s parent and co-Plaintiff herein, relied upon said representations of the **DEFENDANTS**

20  in their selection, purchase, and decision to allow their minor to use the video gaming products as was

21  reasonably foreseeable and for their intended purpose.

22      486.   The herein identified representations by the **DEFENDANTS**, and each of them, were

23  false and untrue. The **DEFENDANTS** knew at the time they were made that they were untrue because

24  the Products were designed to create addictive and disordered use in users, particularly in minors, and

25  as such were not safe for their intended and foreseeable use, nor were they of merchantable quality as

26  represented by the **DEFENDANTS** in that the use of the Products posed catastrophic risk of harm: the

27  Products, as designed, and without warning, were intended to cause or create addictive use that can

28  cause a myriad of physical, mental, and emotional injuries and disorders, including withdrawal

symptoms, brain damage, dissociative behavior, social isolation, damage or negative consequences to and/or cognitive processes, attention disorders, severe depression, morbid obesity, and other harmful effects and damage to the caregivers of users.

487. As a direct and proximate result of the herein alleged false representations made by the **DEFENDANTS**, and each of them, Plaintiff A.G. did develop disordered use of the Products and Plaintiffs did sustain resulting harm, injuries, and damages as a result of that disordered use.

488. The herein alleged conduct of the **DEFENDANTS** was and is willful, malicious, fraudulent, outrageous, and in conscious disregard and indifference to the safety and health of minors, including Plaintiff A.G., and those similarly situated. Plaintiffs, for the sake of example and by way of punishing said defendants, seek punitive damages according to proof.

489. Wherefore, Plaintiffs pray judgment against the **DEFENDANTS**, and each of them, as hereinafter set forth.

### Fifth Cause of Action: Intentional Tort

### (Fraudulent Deceit, Deceit, Concealment - Cal. Civil Code Sections 1708-1710)

490. Plaintiffs reallege and incorporate by reference all of the foregoing allegations of every paragraph of this Complaint as if repeated in full here (except those pertaining exclusively to negligence).

491. At all times pertinent hereto, the **DEFENDANTS**, and each of them, owed Plaintiffs a duty, as provided for in Sections 1708 through 1710 of the Civil Code of the State of California, to abstain from injuring the person, property, or rights of Plaintiffs. When a duty to act was imposed, as set forth herein and as pursuant to Section 1708, the **DEFENDANTS**, and each of them, did acts and omissions in violation of that duty, thereby causing injury to Plaintiffs as is more fully set forth herein. Such acts and omissions consisted of acts falling within Section 1709 (Fraudulent / Intentional Deceit) and Section 1710 (Deceit and Concealment) and, more specifically, included suggestions of fact which were not true and which **DEFENDANTS**, and each of them, did not believe to be true at the time they were made, and had no reasonable ground for believing to be true at the time they were made. In addition, the **DEFENDANTS** caused certain facts they knew or should have known to be true and which they had a duty to disclose to Plaintiffs, and those similarly situated as Plaintiffs, to be

1  suppressed and concealed, all as has been previously alleged herein. Said acts and omissions of the

2  **DEFENDANTS**, with respect to disclosing and concealing certain facts regarding the dangers of the

3  video gaming products as herein alleged, each constitute a violation of the **DEFENDANTS**' duties to

4  act with respect to Plaintiffs and thereby gives rise to a cause of action for the violation of the rights of

5  Plaintiffs as provided for in the aforementioned sections of the California Civil Code.

6      492.   Upon information and belief, prior to the date of initial development of the defective video

7  gaming products, the **DEFENDANTS**, and each of them, knew and possessed the true facts of medical

8  and scientific data and other knowledge which clearly indicated that the design of the video game

9  products could cause compulsive, addictive, and disordered use that was hazardous to the health and

10  safety of users of those products and specifically minors, and particularly minors with neurodivergent

11  qualities, and which would cause injuries and damage to the caregivers of the users of the products,

12  specifically including Plaintiffs herein. With the intent to deceive Plaintiffs and those similarly situated

13  and in Plaintiffs' position, and with the intent that Plaintiffs and such others should be and would stay

14  ignorant of such facts and with the intent to induce Plaintiffs and such others to alter their positions to

15  their injury and/or risk, and in order to gain advantages, the following acts occurred, all upon

16  information and belief:

17  a.    The **DEFENDANTS**, and each of them, did not label any of the aforementioned Products with

18      respect to the dangers they posed to the health and safety of users, including minors users,

19      including Plaintiffs and others in Plaintiffs' position and, to date, still have not labeled any of the

20      video gaming products with a warning or instruction regarding the dangers of using them,

21      products that the **DEFENDANTS** know are unreasonably dangerous because they are designed

22      to cause compulsive, addicted, and disordered use which in turn can cause a myriad of potential

23      physical, mental, and emotional injuries to users. By resolving to not label such products with

24      respect to their known risks and hazards, especially with respect to those posed to minors, the

25      **DEFENDANTS**, and each of them, caused to be suggested as a fact to Plaintiffs and others

26      similarly situated and in their position, that it was and is safe for people including minors to use,

27      including Plaintiff A.G., the Products when in fact it was and is not true and the **DEFENDANTS**,

28      and each of them, did not, do not, and never did believe that to be true;

b. The **DEFENDANTS**, and each of them, suppressed and concealed information relating to the dangers using the Products pose to users, particularly minors and those with neurodivergent qualities, by requesting and agreeing amongst themselves to suppress and conceal said information to the general public, inherently including to Plaintiffs herein, concerning the dangerous nature of their products and thereby precluding such information from being disseminated in a manner which would give general notice and knowledge to the public of the dangerous qualities of the products when the **DEFENDANTS** were bound to disclose such information;

c. The **DEFENDANTS**, and each of them, distributed, designed, sold, and otherwise placed into the stream of commerce the Products to the parents and guardians of minors, specifically including Plaintiff MELISSA BLACK, parent of minor child Plaintiff A.G., herein, without advising them and/or others similarly situated of the addictive dangers using their products posed to minors when each of the **DEFENDANTS** knew of such dangers, and had a duty to disclose such dangers.

493. By said conduct, the **DEFENDANTS**, and each of them, caused to be positively and proactively asserted to Plaintiffs facts, and suggestions of fact, which were not true and which the **DEFENDANTS** had no reasonable ground for believing to be true—to wit, that it was safe and not addictive or otherwise dangerous for people to use the products, and that it was safe for minors to use the Products **DEFENDANTS** placed into the stream of commerce, and into Plaintiffs' hands.

494. By intentionally representing that which was false, *i.e.*, that the Products were safe for use when used in a reasonably foreseeable manner and for their intended purpose, including by minors, the **DEFENDANTS** engaged in reckless representations without regard for the falsity of said representations and without regard for what they knew to be true about the addictive design features incorporated into the products and the injuries and harm that the use of those products could and did cause and which indeed were caused to Plaintiffs herein.

495. The **DEFENDANTS**, and each of them, intended for Plaintiffs and others similarly situated, to rely upon their intentionally and knowingly made false representations, concealment, suppression, and deceit as herein alleged.

496.  Plaintiffs reasonably relied upon said **DEFENDANTS**' intentionally false, deceitful, and reckless representations and concealment as herein alleged, all to the extreme detriment of Plaintiffs.

497.  Plaintiffs' reliance on the **DEFENDANTS**' intentionally false, deceitful, reckless misrepresentations, and acts of concealment of the risks of danger their products posed to the people who used them, particularly minors who used them, as herein identified, was a substantial factor in causing Plaintiffs' injuries and damages.

498.  The **DEFENDANTS** concealed and suppressed the fact that the Products were intentionally designed and sold with addictive features which they knew or should have known posed severe health and safety hazards to users, particularly users who are minors, to whom they were marketed and sold, and **DEFENDANTS** had a duty to disclose said material facts to consumers, including Plaintiffs herein; the **DEFENDANTS** intentionally concealed and suppressed said material fact with the intent to defraud, deceive, and conceal from the Plaintiffs the dangers of their Products by causing Plaintiffs to allow Plaintiff A.G.to initiate using the products in reliance on their false representation that the products were safe to use and posed no health risks.

499.  Plaintiffs were unaware and did not know of said material facts and would not have acted as they did if they had known of the concealed and/or suppressed material facts. Plaintiffs were injured and damaged as herein alleged as a direct and proximate result of the **DEFENDANTS**' concealment and suppression of said material facts and/or misrepresentation of material information specific to the dangers and risks posed by the **DEFENDANTS**' products.

500.  The herein alleged conduct of the **DEFENDANTS** was and is willful, malicious, fraudulent, outrageous, and in conscious disregard and indifference to the safety and health of minors, including Plaintiff A.G. herein, and those similarly situated. Plaintiffs, for the sake of example and by way of punishing said **DEFENDANTS**, seek punitive damages according to proof.

501.  WHEREFORE, Plaintiffs pray judgment against the **DEFENDANTS**, and each of them, as hereafter set forth.

### **Sixth Cause of Action: Concert-of-Action**

502.  Plaintiffs reallege and incorporate by reference all of the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

503.  Upon information and belief, the **DEFENDANTS**, and each of them, caused the harm, injuries, and damages to Plaintiffs, as alleged herein, as the result of each **DEFENDANTS'** independent and conscious decision to participate in the tortious wrongful conduct and misconduct of the other **DEFENDANTS**, individually and as a collective group, by knowingly and through and with a tacit, implicit, or explicit understanding with each of the other **DEFENDANTS**, to substantially assist, encourage, and commit each of the other **DEFENDANTS'** commission of the tortious misconduct as is herein alleged and from which this action arises, inherently including each and every of the alleged negligent, intentionally misrepresentative, and deceitful acts.

504.  Upon information and belief, the **DEFENDANTS**, by entering into licensing agreements with patent-holding entities, individually and/or in concert with one another, and/or via the purchase of certain patents, rely upon, use, and incorporate into the Prodcuts patented designs which are intended to contain and which do contain addictive features and technology designed to cause disordered use, compulsion, or addiction to using the Prodcuts, a design feature to which minors are particularly susceptible.

505.  Microtransactions, many of which are generated as a result of the use of the above addictive features and designs which are monetization schemes the **DEFENDANTS** incorporated into the Products, make up 30% of the total revenue earned across the video game industry. The revenue is split between the developer of the video game itself (*e.g.*, Epic Games or Microsoft/Mojang) and the developer of the systems, devices, and mechanisms which allows users to access and play the video games (*e.g.*, Microsoft, Sony, and/or Nintendo) pursuant to licensing agreements. In so doing, the **DEFENDANTS** herein share profits generated from the defective products here at issue.

506.  Upon information and belief, the **DEFENDANTS** acted in concert and entered into licensing agreements to utilize the same and similar patents to keep users, including minors, Plaintiff A.G. among them, using the video game products more and more until the user developed a disordered compulsion and/or addiction to using the products and thereby engaged regularly, if not chronically, in microtransactions throughout said use, to the benefit of multiple and/or all **DEFENDANTS** as alleged herein.

///

507.  The **DEFENDANTS** use and rely upon the same set of tactics and patent designs rooted in operant conditioning to cause addiction to use their Products, including by incorporating therein features such as feedback loops and reward systems with the intention and design to keep users of the products, specifically minors, using longer. The designs, in the form of patented technologies or otherwise, including reward systems and feedback loop features embedded in the Products makes using the products progressively more stimulative which maximizes usage time and, consequently, increases a user's compulsion to using the products. It is through said alleged use and reliance upon the same type of patented technologies of addictive design features rooted in operant conditioning features that are intended to and which do cause the disordered and addictive use of the video gaming products, that the **DEFENDANTS** engage in both negligent and intentional conduct in collaboration with one another and to their collective financial profit.

508.  The **DEFENDANTS**' choice to incorporate the same or similar patented technologies of addictive design features into the Products arising from licensing agreements with and between each of the **DEFENDANTS** and/or other entities was driven by their collective desire to engage users in a way that would keep them using longer until the user developed a compulsion to use. Upon information and belief, the **DEFENDANTS**, and each of them, entered into agreements to license such patented technology to further the purpose of causing users of their products, and particularly minors who are users, to develop a compulsive and addictive desire to use the products at an increasing rate in order to maximize financial profits from the addictive qualities that the products were intentionally designed to trigger within users. In so doing, upon information and belief, the **DEFENDANTS**, and each of them, aided and abetted each of the other **DEFENDANTS**' tortious wrongful conduct as is herein alleged with the specific intent to facilitate the tortious wrongful conduct of placing the defective, dangerous, and addictive Products into the stream of commerce, including into the hands of the Plaintiffs herein to their extreme detriment and damage as herein alleged.

509.  Upon information and belief, each of the **DEFENDANTS** aided and abetted one another by making a conscious decision and/or pursuant to a common design to participate in the tortious wrongful act of intentionally representing that which was false, *i.e.*, that the video gaming products were safe for use, including by minors, without regard for the falsity of said representations and without

regard for what they knew to be true about the addictive design and injuries and harm caused by using the video gaming products.

510. Upon information and belief, the substantial assistance, encouragement, commission, and aiding and abetting each of the **DEFENDANTS** provided each of the other **DEFENDANTS** in committing the tortious wrongful conduct as is herein alleged was a substantial factor in causing the harm and damages to Plaintiffs and is the cause in fact and proximate cause of that harm.

511. Upon information and belief, the **DEFENDANTS** agreed to and did commit the tortious acts alleged herein in concert with one another, *i.e.*, the others, and/or pursuant to a common design with the others and/or with the knowledge that one or more of the others' conduct constituted a breach of a duty and gave substantial assistance or encouragement to said other **DEFENDANTS** to engage in such conduct, and/or gave substantial assistance to the others in accomplishing a tortious result with each of the **DEFENDANTS'** individual conduct, separately considered, constituting a breach of duty to the Plaintiffs. As such, the **DEFENDANTS**, in pursuing a common plan or design to commit a tortious act, in actively participating in a tortious act, and in lending aid or encouragement to the wrongdoing in cooperating with the wrongdoer and there by ratifying or adopting the others' acts done for their collective benefit, are equally liable for each of the other **DEFENDANTS'** tortious acts, including wrongful tortious failures to act.

512. As a result of each of the **DEFENDANTS'** resolve to engage in the decision to take action in pursuance of a common plan or design to commit the tortious wrongful acts as herein alleged with each of the other **DEFENDANTS**, each **DEFENDANT** actively took part in said tortious wrongful conduct or furthered it by cooperation or request, or lent aid or encouragement to the other wrongdoing **DEFENDANTS**, or ratified and adopted the wrongful acts done for their individual and collective benefit, each of the **DEFENDANTS** are equally liable for the damages sustained by Plaintiffs herein.

513. The **DEFENDANTS**, individually and as a collective group, by knowingly and through and with a tacit, implicit, or explicit understanding with each of the other **DEFENDANTS**, to substantially assist, encourage, and commit each of the other **DEFENDANTS'** commission of the tortious misconduct of representing that the Products were safe, intended to and did cause the general consumer public, including Plaintiffs herein, to remain ignorant of the dangers the Products posed to

users, including to minor users, when used for their intended purpose and as reasonably foreseeable, and thereby deprived caregivers of a meaningful opportunity to decide if they wished to allow the minor child under their care, including Plaintiff A.G., to be exposed to using products designed to create compulsive use capable of causing severe injuries and damages, and/or denied such persons the opportunity to take precautions against the dangers and risks those products posed to their child, including A.G.

514.  The herein alleged conduct of the **DEFENDANTS** was and is willful, malicious, fraudulent, outrageous, and in conscious disregard and indifference to the safety and health of minors, including Plaintiff A.G. and those similarly situated. Plaintiffs, for the sake of example and by way of punishing said defendants, seek punitive damages according to proof.

515.  WHEREFORE, Plaintiffs pray judgment against the **DEFENDANTS**, and each of them, as hereafter set forth.

### REQUEST FOR PUNITIVE DAMAGES

516.  Plaintiffs reallege and incorporate by reference all of the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

517.  Plaintiffs are entitled to punitive damages because the actions of the **DEFENDANTS** as described and alleged herein were malicious, wanton, willful, or oppressive or were done with reckless indifference to Plaintiffs and the public's safety and welfare. The **DEFENDANTS** misled Plaintiffs, other users and/or purchasers of the Products, as well as the public at large, inherently including Plaintiffs, by making false representations, and misrepresentations by way of omission, about the safety and risks associated with their products. The **DEFENDANTS** downplayed, understated, concealed, suppressed, and/or disregarded the fact that they knew or should have known that their products posed severe, potentially catastrophic, permanent injuries and risks associated with the foreseeable use of the products.

518.  With the execution and exercise of reasonable diligence, the **DEFENDANTS** were or should have been in possession of information and evidence demonstrating that their products posed a risk of causing a myriad of severe if not catastrophic injuries to the users thereof, particularly minors,

but **DEFENDANTS**, individually and concert with one another, nevertheless participated in placing said products into the stream of commerce and into Plaintiffs' hands.

519.  The **DEFENDANTS** continue to place their products into the stream of commerce via the provision of false and misleading information, and/or by omitting to disclose or disseminate vital information, regarding the unreasonably dangerous nature of their products and the risks the operant conditioning and other addictive design features incorporated into the products pose to users thereof, and specifically to minors. The addictive design and absence of a warning of known or knowable risks of danger posed by using the products is a substantial factor in causing users to develop addicted or disordered gaming behaviors which in turn cause catastrophic and/or permanent injuries such as a gaming disorder diagnosis, damage to the prefrontal cortex causing lower cognitive function and an inability to regulate impulse control, as well as other negative effects such as attention disorders, verbal memory deficiencies, sleeping disorders in addition to other physical, mental, and emotional disorders that cause serious harm to the safety and well-being of the users of the products, just like the injuries that were caused thereby to Plaintiff A.G. as alleged herein.

520.  Upon information and belief, all times relevant to the injuries and allegations pleaded herein, the **DEFENDANTS**, before, during, and after their participation in placing into the stream of commerce the Products were aware of the dangers and risks posed by those products and could have either designed the games differently so as to minimize or preclude and prevent the risks they posed to users and, in addition and/or in the alternative, could have provided a warning conveying the dangers and risks posed by the foreseeable use of the products to the consuming public and users of the products, Plaintiffs among them.

521.  Despite that awareness, the **DEFENDANTS** consciously and purposefully decided against the above-described measures via a disclosure or warning, and instead chose to gamble with the safety of the public, specifically minors whose brains are not fully developed who are most vulnerable and susceptible to the risks posed by the Products.

522.  Furthermore, upon information and belief, the **DEFENDANTS**, upon becoming aware of the inherent dangers and risks posed by the Products, and learning and/or otherwise knowing of safer practical alternate designs and the need and propriety of providing a warning to the consumer public

1   of the known or knowable dangers of the products, failed to recall the products or retrofit the products

2   with a safer design, and also failed to adequately warn the public about the risks and dangers the

3   products posed to users, especially minors.

4        523. The **DEFENDANTS**' actions as described above were performed willfully, intentionally,

5   and with a conscious disregard for the rights, health, and safety of Plaintiffs and the consumer public.

6   Accordingly, Plaintiffs seek and are entitled to punitive damages in an amount to be determined at

7   trial.

8                          **PRAYER**

9       WHEREFORE, Plaintiffs pray for judgment against the **DEFENDANTS**, and each of them as

10   appropriate to each and every cause of action alleged and as appropriate to the particular standing of

11   Plaintiffs, as follows:

12       1.   For Plaintiffs' general damages, including pain and suffering and emotional distress,

13   according to proof at the time of trial;

14       2.   For Plaintiffs' past and future economic and special damages according to proof at the

15   time of trial;

16       3.   For Plaintiffs' medical and related expenses according to proof at the time of trial;

17       4.   For Plaintiffs' prejudgment interest, pursuant to California Civil Code § 3291, according

18   to proof at the time of trial;

19       5.   For Plaintiffs' costs of suit herein;

20       6.   Injunctive relief;

21       7.   Attorney's fees;

22       8.   For exemplary and/or punitive damages according to proof at the time of trial; and

23       9.   For such other and further relief, whether at law or in equity, to which this Court deems

24   just and proper.

25   Dated: August 16, 2024           **GOMEZ TRIAL ATTORNEYS**

26

27

28                         John H. Gomez, Esq. (CA Bar No. 171485)

1  Joshua R. Harris, Esq. (FL Bar No. 124124)
   *(Pro Hac Vice Pending)*
2  755 FRONT STREET
   SAN DIEGO, CA 92011
3  john@getgomez.com
   josh@getgomez.com
4
5  **HAIR SHUNNARAH TRIAL ATTORNEYS**
   GALEN M. HAIR (LA Bar No. 32865)
6  *(Pro Hac Vice Pending)*
   KYLE C. USNER (LA Bar No. 38923)
7  *(Pro Hac Vice Pending)*
   3001 17TH ST, METAIRIE, LA 70002
8  hair@hstalaw.com
   kusner@hstalaw.com
9
10  *Attorneys for Plaintiff*

11

12  <u>**DEMAND FOR JURY TRIAL**</u>

13  Plaintiffs hereby demand a trial by jury as to all of their claims so triable.

14

15  Dated: August 16, 2024         **GOMEZ TRIAL ATTORNEYS**

16

17  _____

18  John H. Gomez, Esq. (CA Bar No. 171485)
    Joshua R. Harris, Esq. (FL Bar No. 124124)
19  *(Pro Hac Vice Pending)*
    755 FRONT STREET
20  SAN DIEGO, CA 92011
    john@getgomez.com
21  josh@getgomez.com

22  **HAIR SHUNNARAH TRIAL ATTORNEYS**
    GALEN M. HAIR (LA Bar No. 32865)
23  *(Pro Hac Vice Pending)*
    KYLE C. USNER (LA Bar No. 38923)
24  *(Pro Hac Vice Pending)*
    3001 17TH ST, METAIRIE, LA 70002
25  hair@hstalaw.com
    kusner@hstalaw.com
26
27  *Attorneys for Plaintiff*

28